123 Cal.Rptr.2d 599 (2002)
101 Cal.App.4th 69
James B. PANTHER, Plaintiff and Appellant,
v.
William K. PARK et al., Defendants and Respondents.
James B. Panther, Petitioner,
v.
The Superior Court of San Diego County, Respondent,
William K. Park et al., Real Parties in Interest.
Nos. D039601, D039633.
Court of Appeal, Fourth District, Division One.
August 12, 2002.
Rehearing Denied September 3, 2002.
Review Granted October 23, 2002.
Review Transferred January 15, 2003.
*600 Mazzarella, Dunwoody & Caldarelli, Steven A. Micheli, San Diego, and Mark C. Mazzarella for Plaintiff and Petitioner.
Seltzer, Caplan, McMahon & Vitek, Reg A. Vitek, Jack R. Leer and Matthew M. Mahoney, San Diego, for Defendant and Real Party in Interest Canam Properties.
Neil, Dymott, Perkins, Brown & Frank, Michael I. Neil and James A. McFall, San
Diego, for Defendant and Real Party in Interest Financial Asset Management Foundation.
Drath, Clifford, Murphy, Wennerholm & Hagan, John R. Clifford and Tammara N. Tukloff for Defendant and Real Party in Interest Ken Tremblett.
Review Transferred to Court of Appeal January 15, 2003.
McINTYRE, J.
We hold in this case that the personal disqualification of an attorney based on an earlier adverse representation will not automatically lead to the vicarious disqualification of a law firm in a different but substantially related litigation; rather, the law firm may rebut a presumption of shared confidences and avoid vicarious disqualification by showing that effective screening methods were in place that prevented the passing of confidential information from the individual attorney to others in the firm.
James B. Panther has petitioned this court for a writ of mandate directing the superior court to set aside its order granting the motion of CanAm Properties, LLC (CanAm), William Park, and Financial Asset Management Foundation (FAMF) to disqualify Panther's counselthe firm of Mazzarella, Dunwoody & Caldarelli (the Mazzarella firm) and one of its partners, Steven Micheli, and to enter an order denying the motion. We issued an order to show cause and a temporary stay, and for the reasons set forth below, we issue a writ of mandate directing the trial court to vacate its order granting the motion to disqualify Panther's counsel and to enter an order denying the motion. This renders Panther's appeal of the disqualification order moot.

FACTUAL AND PROCEDURAL BACKGROUND
In February 1999, Panther brought an action against CanAm, its president and *601 managing partner, Russell Grosse, FAMF and Park, who controlled FAMF as its sole trustee, for wrongfully foreclosing on Panther's interest in real property (hereafter sometimes referred to as the Panther v. Grosse litigation). Panther was represented by Micheli, his attorney since 1982. Grosse was represented by Stephen Schreiner, who on Grosse's behalf, executed a joint defense agreement with FAMF regarding the litigation. The agreement provided for the exchange of privileged communications, attorney work product, and discovery (together referred to as "Common Interest Privileged Information"), in order to "facilitate the representation and anticipated defense of the Parties in the Litigation."
CanAm and FAMF, which had taken control of CanAm in the course of the litigation, filed cross-complaints against Panther, alleging, inter alia, that he defrauded FAMF's investors, and breached his fiduciary duty to CanAm and had improperly managed CanAm's affairs. In the course of discovery, Park, and Ken Tremblett, a member of CanAm's management committee, learned that Panther held a stock option in a company called the Credit Store, Inc. and was in negotiations with a Jay Botchman regarding Botchman's purchase of Panther's shares in the Credit Store, Inc. once Panther exercised the option. Park informed Botchman of the litigation, sent him the pleadings, and he and Tremblett told Botchman at various times that FAMF and CanAm would win the case, and in particular, would prevail on their cross-complaints and would be able to execute on the judgment(s) by taking over Panther's stock option rights. Park and Tremblett claimed that once they did so, they would sell the stock to Botchman for a total of $3 million, one-third of the $9 million sales price he and Panther had agreed to. Botchman declared that as a result of these communications, he believed CanAm and FAMF would prevail in the litigation and would take control of Panther's stock option, and thus decided not to buy the stock from Panther for $9 million, but to wait until FAMF and CanAm obtained the option rights and then purchase it for $3 million.
Park disagreed below with "Botchman's characterization of [their] communications" but confirmed that he and Tremblett discussed the claims against Panther in the Panther v. Grosse litigation and the status of Panther's stock option as a possible source of recovery if CanAm and/or FAMF prevailed. Park also declared that in accordance with the joint defense agreement, confidential information was shared between him, FAMF's attorney, Grosse and Schreiner pertaining to the strategies, merits, strengths and weaknesses of FAMF's and Grosse's defenses, as well as the merits of FAMF's and CanAm's cross-complaints. Schreiner also remembered discussing the Panther v. Grosse litigation with Park, Grosse and the attorneys for CanAm and FAMF in a confidential settlement conference.
Contrary to Park's assertions, CanAm and FAMF did not prevail on the cross-complaints. CanAm's cross-complaint was dismissed by nonsuit during trial, and the jury found in favor of Panther on FAMF's cross-complaint.
In October 2000, Panther, represented by the Mazzarella firm, brought the instant action against, inter alia, Park, Tremblett, CanAm and FAMF (but not Grosse) alleging slander, defamation of character, negligent and intentional interference with contractual relationships, and negligent and intentional interference with prospective economic advantage, based on statements Park and Tremblett had made to Botchman regarding Panther's stock option *602 and the Panther v. Grosse litigation. (Panther v. Park et al.)
A year later, on October 1, 2001, after the conclusion of the Panther v. Grosse litigation and after his former firm had dissolved, Schreiner became associated with the Mazzarella firm as an independent contractor, where he is paid a certain percentage of what he originates, bills and collects. Schreiner brought with him his paralegal from his former firm, and uses his own computer and printer. He is not networked into the Mazzarella firm's computer system and does not use their system. Schreiner's current case files are maintained in the office of his paralegal, and he does not have access to the files of the Mazzarella firm. When he moved to the firm, Schreiner was no longer involved in any litigation involving Panther, and his files relating to the Panther v. Grosse litigation were in storage and not kept at the Mazzarella firm. Schreiner and Micheli spoke before Schreiner moved to the Mazzarella office, and Micheli told him because he would continue to represent Panther as he had for the preceding 19 years, he would not be discussing any aspect of the Panther litigation with Schreiner and instructed Schreiner to refrain from discussing the matter. There were also two other meetings between Schreiner and the Mazzarella firm partners at which the topic of not discussing or disclosing any information pertaining to the Panther matter was discussed. Micheli also testified that he spoke to the firm's associates and staff about Schreiner's moving his offices, and instructed them not to discuss the Panther case with him. Before Schreiner moved, Micheli sent an email to all personnel in the firm reminding them of this edict. Micheli also put in place procedures for handling mail related to the Panther matter, so that all such mail would be routed to Micheli who would ensure nothing pertaining to Panther was routed to Schreiner. In addition, Micheli instructed Panther not to talk to Schreiner if he saw him in the office. Schreiner testified that he had not shared any information with Panther, which Micheli corroborated. Neither Schreiner nor Micheli knows of any instance in which the screening procedures have failed.
In November 2001, Park was deposed at the Mazzarella firm in a related bankruptcy proceeding and learned that Schreiner had moved to the firm. Shortly thereafter, FAMF, CanAm and Park moved to disqualify the Mazzarella firm and Micheli from representing Panther in the Panther v. Park et al. litigation. The trial court granted the motion, concluding that confidential information had been exchanged between FAMF, CanAm, Park, Grosse and Schreiner in the course of the Panther v. Grosse litigation that was substantially related to Panther v. Park et al, which would disqualify Schreiner and vicariously disqualify the Mazzarella firm. The court stated no California case had sanctioned the use of screening procedures where former government attorneys were not involved, and held further that screening procedures should not work to prevent automatic disqualification where the firm is aware that the attorney was in a confidential relationship with an opposing party.

DISCUSSION

STANDARD OF REVIEW
In general, a trial court's decision on a motion for disqualification of counsel is reviewed under the abuse of discretion standard. (People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135, 1143, 86 Cal.Rptr.2d 816, 980 P.2d 371 (SpeeDee Oil).) If the trial court resolves disputed factual issues and substantial evidence *603 supports the factual findings, we review the conclusions for abuse of discretion. (Id. at p. 1144, 86 Cal.Rptr.2d 816, 980 P.2d 371.) However, the court's discretion is limited by applicable legal principles, and its exercise of discretion on a disqualification motion will be carefully reviewed. (Ibid.)

DISQUALIFICATION OF SCHREINER
The trial court found that Schreiner, Grosse, CanAm, FAMF, Park and their attorneys participated in a joint defense in the Panther v. Grosse litigation, and Schreiner obtained confidential information from these people and entities as part of his providing legal services in the litigation. The court concluded that such information was sufficiently related to the Panther v. Park et al. litigation to require the disqualification of Schreiner. We will not disturb this conclusion, which, as set forth in the facts section of the opinion, is based on findings supported by substantial evidence. In a motion to disqualify based on a conflict of interest, "[t]he primary concern is whether and to what extent the attorney acquired confidential information .... An attorney represents a client for purposes of a conflict of interest analysiswhen the attorney knowingly obtains material confidential information from the client and renders legal advice" (SpeeDee Oil, supra, 20 Cal.4th at p. 1148, 86 Cal. Rptr.2d 816, 980 P.2d 371; see also U.S. v. Henke (9th Cir.2000) 222 F.3d 633, 637 [a joint defense agreement establishes an implied attorney client relationship with the co-defendant, and the extension of the attorney-client privilege therein may create a conflict where information obtained in confidence is related to subsequent litigation].) Under the circumstances as found by the trial court, the individual attorney, in this case Schreiner, will be disqualified from later representation that is adverse to the parties from which he obtained material confidential information in the course of an earlier litigation. (See SpeeDee Oil, supra, 20 Cal.4th at p. 1148, 86 Cal.Rptr.2d 816, 980 P.2d 371.)

VICARIOUS DISQUALIFICATION OF THE MAZZARELLA FIRM
We do not agree with the court's conclusion that the disqualification of Schreiner required the vicarious disqualification of the Mazzarella firm, however. Until recently, the California Supreme Court has been silent on the issue of whether the presumption of shared confidences within a firm is rebuttablei.e., whether a firm can avoid automatic vicarious disqualification by taking prophylactic measures to prevent the "tainted attorney" from passing information to other members of the firm. (See In re County of Los Angeles (9th Cir.2000) 223 F.3d 990, 995.) California courts of appeal have generally held that the presumption, in the case of private attorneys, is not rebuttable. (See Henriksen v. Great American Savings & Loan (1992) 11 Cal.App.4th 109, 114-115, 14 Cal.Rptr.2d 184.) Law firms that employ former government attorneys, however, have been allowed to rebut the presumption by showing they have taken sufficient protective measures to screen the individual attorney from the litigation at issue. (See Chambers v. Superior Court (1981) 121 Cal.App.3d 893, 902, 175 Cal.Rptr. 575.)
In SpeeDee Oil, the Supreme Court appears to have cast doubt on the view that there is a mandatory irrebuttable presumption of shared confidences between a tainted private attorney and the law firm with which he or she is or becomes associated. (SpeeDee Oil, supra, 20 Cal.4th at pp. 1151-1152, 86 Cal.Rptr.2d 816, 980 P.2d 371.) SpeeDee Oil involved an attorney who, for a period, represented one party while the firm to which he was of *604 counsel represented an adverse party in the same litigation. (Id. at pp. 1140-1142, 86 Cal.Rptr.2d 816, 980 P.2d 371.) In its discussion, the court cited two federal cases, INA Underwriters Ins. Co. v. Rubin (E.D.Pa.1983) 635 F.Supp. 1, 5-6 and Hughes v. Paine Webber, Jackson & Curtis Inc. (N.D.Ill.1983) 565 F.Supp. 663, 672-673, in which law firms were allowed to rebut the presumption of shared confidences within a firm by showing sufficient screening methods had been implemented that prevented confidential information from being passed by the individual attorney to others in the firm. (SpeeDee Oil, supra, 20 Cal.4th at pp. 1150-1151, 86 Cal.Rptr.2d 816, 980 P.2d 371.) However, the court in SpeeDee Oil stated it "need not consider" whether a firm could rebut the presumption in this manner and avoid disqualification, because in the case before it, the firm failed to establish that any effective screening procedures were implemented at all. (Id. at pp. 1152-1153, 86 Cal.Rptr.2d 816, 980 P.2d 371.) The court also noted that the case at issue involved a conflicting representation in the same matter, rather than successive conflicting representations in substantially related matters as was the case in INA and Hughes and is the case here, and which may pose less a threat to the attorney client relationship. (SpeeDee Oil, supra, 20 Cal.4th at pp. 1150-1151, 86 Cal.Rptr.2d 816, 980 P.2d 371.) Significantly, in a case most likely to give rise to disqualification because the same firm represented adverse parties in the same litigation, the court in SpeeDee Oil did not hold that the presumption of shared confidences within a firm is irrebuttable. (Ibid.)
We conclude that the better view is that law firms, whether they hire or otherwise associate former government attorneys or private attorneys, should be able to rebut the presumption of shared confidences within a firm and therefore avoid vicarious disqualification by showing that effective screening procedures were implemented to prevent the passing of information between the tainted lawyer and other members of the firm. A rule of automatic vicarious disqualification of an entire firm does not comport with the realities of today's legal world and the increased mobility of lawyers among firms, and can cause unnecessary serious hardship for the lawyer, the firm and particularly, the firm's clients, who bear the burden of losing the counsel of their choice when the firm is vicariously disqualified. (See In re County of Los Angeles, supra, 223 F.3d at p. 996, and authorities cited therein.) It is not only that individual attorneys voluntarily change association with greater frequencylaw firms constrict, dissolve or merge with other firms with increasing regularity, and automatic vicarious disqualification puts an unnecessary restraint on the legal market place and the rights of clients to be represented by their chosen counsel. Indeed, such a rule also creates potential for abuse, since a motion to disqualify a law firm is a powerful litigation tactic to deny an opposing party the counsel of its choice. (Ibid.)
Such hardships and potential for abuse would be warranted if automatic vicarious disqualification were the only way to ensure that confidences not be shared among lawyers within a firm. This is not the case, however. A client's confidences can be maintained by adopting and implementing measures to screen the tainted lawyer from the litigation or matter at issue, and where a law firm can show that it has timely and effectively implemented such measures, it should be able to rebut the presumption that the lawyer has contaminated the entire firm and avoid vicarious disqualification. (In re County of Los Angeles, supra, 223 F.3d at p. 996.) Such an approach protects client confidences while *605 allowing attorneys mobility in their careers, and enables clients to continue to be represented by the counsel of their choice. In other words, in lieu of automatic vicarious disqualification, there needs to be a balance between the interests of the clients of (and those who furnished material confidential information to) a disqualified attorney on the one hand, and the clients of the law firm with which he or she become associated on the other.
In this case, Schreiner's involvement in Panther v. Grosse had concluded before he became associated with the Mazzarella firm and he did not directly represent any of the defendants in Panther v. Park, et al. In contrast, Micheli had been Panther's attorney for 19 years, and had represented him in both matters. Under the circumstances, the Mazzarella firm should be given the opportunity to rebut the presumption of automatic vicarious disqualification. To hold otherwise would place an unwarranted burden particularly on the firm's current client, Panther.
Having reviewed the record, we conclude that the Mazzarella firm demonstrated that effective screening measures prevent Schreiner from sharing confidences he obtained in the course of the Panther v. Grosse litigation with others at the Mazzarella firm. When Schreiner moved to the Mazzarella firm, he was no longer involved in any aspect of any litigation involving Panther. Indeed, contrary to the assertions of the real parties in interest at oral argument, he did not "switch sides" in the litigation. He did not bring his files relating to the Panther v. Grosse litigation to the firm and does not have access to the Mazzarella firm's files. He also is not connected with and does not use the firm's computer system. In addition, Schreiner and the attorneys and staff of the Mazzarella firm were instructed not to discuss issues regarding or relating to Panther, and all mail relating to the Panther matter is routed to Micheli who ensures it does not go to Schreiner. Micheli also instructed Panther not to speak with Schreiner if he saw him in the office. Schreiner also testified, as did Micheli, that they know of no instance when the screening failed. Such measures undertaken in a relatively small firm like Mazzarella are adequate; they protect the legitimate interests of FAMF, Park, CanAm and Tremblett, and rebut the presumption of shared confidences between Schreiner and the Mazzarella firm. (In re County of Los Angeles, supra, 223 F.3d at pp. 996-997.)
Accordingly, the Mazzarella firm and Micheli should not have been vicariously disqualified from representing Panther, and thus, we hold the trial court abused its discretion in granting respondent's motion to disqualify.

DISPOSITION
Let a writ of mandate issue ordering the Superior Court of San Diego County to vacate its order granting the motion for disqualification and to enter an order denying the motion. The related appeal is dismissed as moot. Costs are awarded to petitioner.
We concur: HALLER, Acting P.J. and McDONALD, J.