VISA U.S.A., INC., Plaintiff,

v.

FIRST DATA CORPORATION, et al., Defendants.

No. C–02–1786 PJH.

United States District Court, N.D. California.

Jan. 29, 2003.

Geraldine Mary Daly Alexis, Jonathan P. Hersey, Raymond Lara, Beth H. Parker, Victoria Wong, David J. Zack, Bingham McCutchenLLP, San Francisco, CA, for Defendants.

M. Laurence Popofsky, Stephen V. Bomse, Scott A. Westrich, Aaron M. Armstrong, Jarrod Wong, Heller Ehrman White & McAuliffe LLP, San Francisco, CA, for Plaintiff Visa U.S.A., Inc.

George A. Riley, Scott A. Schrader, O'Melveny & Myers LLP, San Francisco, CA, for Heller Ehrman White & McAuliffe LLP.

## AMENDED ORDER DENYING MOTION TO DISQUALIFY COUNSEL[1]

HAMILTON, District Judge.

Defendant First Data Corporation's motion to disqualify the law firm of Heller Ehrman White & McAuliffe as counsel for plaintiff Visa came on for hearing on October 9, 2002 before this court, the Honorable Phyllis J. Hamilton presiding. First Data appeared by its counsel, Geraldine M. Alexis; Visa appeared by its counsel, M. Laurence Popofsky; and Heller appeared by its counsel, George A. Riley.[2] Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court rules as follows for the reasons stated at the hearing.

### BACKGROUND

Plaintiff Visa sued defendant First Data in April 2002 for trademark infringement, dilution, and various breach of contract claims. First Data has contracted with Visa to process financial transactions on Visa's (and other credit card companies') behalf. First Data has recently launched a new business initiative, which will allow First Data to bypass Visa's regulations on the processing of certain Visa-related transactions (known as "private arrangements"). Visa claims these private arrangements violate its contractual and trademark rights.

Visa is represented in this matter by Heller's San Francisco office. In March 2001, before this lawsuit was filed, First Data was sued in an unrelated patent infringement action currently pending in the District of Delaware. First Data sought to retain Heller's Silicon Valley office as counsel in the Delaware action. After running a conflicts check, Heller informed First Data that it had a long-standing relationship with Visa. While Heller did not see any conflicts between the two parties at that time, Heller could not represent First Data in the patent infringement case unless First Data agreed to permit Heller to represent Visa in any future disputes, "including litigation," that might arise between First Data and Visa. First Data consented to those terms, which were memorialized in an engagement letter between Heller and First Data. The relevant portion of the letter states:

> Our engagement by you is also understood as entailing your consent to our representation of our other present or future clients in "transactions," including litigation in which we have not been engaged to represent you and in which you have other counsel, and in which one of our other clients would be adverse to you in matters unrelated to those that we are handling for you. In this regard, we discussed [Heller's] past and on-going representation of Visa U.S.A. and Visa International (the latter mainly with respect to trademarks) (collectively, "Visa") in matters which are not currently adverse to First Data. Moreover,

---

1. This order amends the order filed on October 16, 2002 by removing the "Not for Citation" designation and correcting typographical errors.

2. Given the nature of the charges raised by First Data against Heller and the existence of an ethical wall between certain attorneys at Heller, Heller hired independent outside counsel to represent its interests in this motion. The court finds good cause to permit Heller to appear through outside counsel on this motion.

as we discussed, we are not aware of any current adversity between Visa and First Data. Given the nature of our relationship with Visa, however, we discussed the need for the firm to preserve its ability to represent Visa on matters which may arise in the future including matters adverse to First Data, provided that we would only undertake such representation of Visa under circumstances in which we do not possess confidential information of yours relating to the transaction, and we would staff such a project with one or more attorneys who are not engaged in your representation. In such circumstances, the attorneys in the two matters would be subject to an ethical wall, screening them from communicating from [sic] each other regarding their respective engagements. We understand that you do consent to our representation of Visa and our other clients under those circumstances.

Jeronimus Decl. Exh. A ("waiver letter"). After First Data agreed to the waiver, Visa also agreed to Heller's dual representation. Allen Decl. ¶ 20.

A few months later, in July 2001, First Data publicly announced its intention to launch its new private arrangement plan, and in the beginning of 2002, First Data officially notified Visa. Visa then sued First Data. First Data in response threatened antitrust counterclaims against Visa, and then began settlement discussions. Almost four months after the complaint was filed, and shortly after settlement talks broke down, First Data informed Visa in August 2002 that it intended to move to disqualify Heller as counsel for Visa in this matter.[3]

First Data claims that when it signed the waiver letter, it was not adequately informed of the possibility that its patent counsel could sue it for millions of dollars in damages and raise claims disparaging First Data and attacking the very core of its business. First Data contends that under the California Rules of Professional Conduct, Heller at a minimum was required to reaffirm First Data's prospective consent when the actual conflict between Visa and First Data arose. First Data has also indicated that it believes that Heller's patent lawyers have access to confidential information from First Data that Visa could use against First Data in this action.

Heller and Visa argue that First Data was fully informed about the situation and agreed to allow Heller to represent Visa in future litigation against First Data. Heller and Visa argue that the California Rules of Professional Conduct and other ethical rules expressly permit prospective written consent to a conflict waiver, and that no rules require Heller to obtain a second consent to continue in their representation of Visa. Heller also indicates that it has put an ethical wall in place that adequately protects First Data's confidential information.

## DISCUSSION

A. Motion to Disqualify Counsel—Legal Standards

■ The Northern District of California has adopted the California Rules of Professional Conduct at Civ. L.R. 11–4, and attorneys practicing in this court are required to adhere to those standards, as articulated in the rules and any court decisions interpreting them. *See* Civ. L.R. 11–4 commentary. The right to disqualify counsel is within the discretion of the trial court as an exercise of its inherent powers.

---

**3.** In light of this motion and the allegations that First Data has raised against it, Heller has offered to withdraw as counsel on the patent litigation matter, but First Data has insisted that Heller stay on. *See* Epsen Decl. Exhs. E–F.

*See United States v. Wunsch,* 84 F.3d 1110, 1114 (9th Cir.1996) (district court has inherent power to sanction unethical behavior); *Image Technical Serv., Inc. v. Eastman Kodak Co.,* 820 F.Supp. 1212, 1215 (N.D.Cal.1993) (incorporating California state law standard for disqualification of counsel in the Northern District); Cal. Code Civ. Proc. § 128(a)(5).

■ Motions to disqualify counsel are strongly disfavored. *See, e.g., Gregori v. Bank of America,* 207 Cal.App.3d 291, 300–301, 254 Cal.Rptr. 853 (1989) ("[M]otions to disqualify counsel often pose the very threat to the integrity of the judicial process that they purport to prevent."); *In re Marvel,* 251 B.R. 869 (Bankr.N.D.Cal. 2000), aff'd 265 B.R. 605 (N.D.Cal.2001) ("A motion for disqualification of counsel is a drastic measure which courts should hesitate to impose except when of absolute necessity. They are often tactically motivated; they tend to derail the efficient progress of litigation."). Thus, such requests "should be subjected to particularly strict judicial scrutiny." *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.,* 760 F.2d 1045, 1050 (9th Cir.1985) (citations omitted).

■ In reviewing a motion to disqualify counsel, the district court must make "a reasoned judgment and comply with the legal principles and policies appropriate to the particular matter at issue." *Gregori* at 300, 254 Cal.Rptr. 853 (citations omitted). The district court is permitted to resolve disputed factual issues in deciding a mo-

tion for disqualification and must make findings supported by substantial evidence. *Dept. of Corporations v. SpeeDee Oil Change Syst.,* 20 Cal.4th 1135, 1143, 86 Cal.Rptr.2d 816, 980 P.2d 371 (1999).

**B. Simultaneous Representation of Adverse Clients and Written Waivers**

**1. Conflict Waiver Letters**

■ First Data claims that Heller has violated Cal. Rule of Prof. Conduct 3–310(C)(3), which states:

A member [of the California State Bar] shall not, without the informed written consent of each client:

. . . (3) represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.[4]

First Data argues that this rule automatically disqualifies Heller from representing both Visa and First Data, even though First Data's patent litigation is unrelated to this action, citing *Flatt v. Superior Court,* 9 Cal.4th 275, 284–285, 36 Cal. Rptr.2d 537, 885 P.2d 950 (1994) and *Mindscape, Inc. v. Media Depot,* 973 F.Supp. 1130, 1131 (N.D.Cal.1997).

■ When evaluating whether a law firm may concurrently represent two clients, even on unrelated matters, it is presumed that the duty of loyalty has been breached and counsel is automatically disqualified. *Flatt,* 9 Cal.4th at 284–85, 36

---

4. At oral argument, First Data claimed that Cal. Rule of Prof. Cond. §§ 3–310(C) (1) and (2) also applied to Heller's conduct. Sections 3–310 (C)(1) and (2), though, apply only to the simultaneous representation of parties in the same action, as First Data itself admits. *See* Cal Rule of Prof. Conduct 3–310(C) ("a member shall not, without the informed written consent of each client, (1) accept representation of more than one client in *a matter* in

which the interests of the clients potentially conflict, or (2) accept representation of more than one client in *a matter* in which the interest of the client actually conflict;" emphasis added); *see also Zador Corp., N.V. v. Kwan,* 31 Cal.App.4th 1285, 1294, 37 Cal.Rptr.2d 754 (1995) (stating that 3–310(C)(1) and (2) apply only to joint representations in the same action); First Data Opening Br. at 10 (same). Those sections thus are not at issue here.

Cal.Rptr.2d 537, 885 P.2d 950. But, as Visa and Heller note, the presumption may be rebutted and a law firm may nonetheless simultaneously represent two adverse clients if full disclosure of the situation is made to both clients and both agree in writing to waive the conflict. *Id.* at 285 n. 4, 36 Cal.Rptr.2d 537, 885 P.2d 950. Here, it is undisputed that Heller and First Data executed a conflict waiver letter. *See* Waiver Letter. Neither *Flatt* nor *Mindscape* involved situations where a conflict waiver letter had been executed, and thus they do not control. *Flatt,* 9 Cal.4th at 285 n. 4, 36 Cal.Rptr.2d 537, 885 P.2d 950 (specifically noting that no written conflict letter was executed); *Mindscape,* 973 F.Supp. at 1133 (no waiver letter at issue). Thus, Heller is not automatically disqualified from representing both Visa and First Data.

### 2. Prospective Waivers

■ First Data next argues that Heller's use of a prospective waiver, which purported to waive all future conflicts between Visa and First Data, was improper without, at minimum, a second disclosure and waiver once the situation between Visa and First Data ripened into an actual conflict. Visa and Heller argue that the prospective waiver signed by First Data was proper and fully informed, and thus no second waiver was required.

An advance waiver of potential future conflicts, such as the one executed by First Data and Heller, is permitted under California law, even if the waiver does not specifically state the exact nature of the future conflict. *Maxwell v. Superior Court,* 30 Cal.3d 606, 622, 180 Cal.Rptr. 177, 639 P.2d 248 (1982) (not requiring counsel to outline every conceivable possibility of potential conflict for a prospective waiver to be valid); Cal. State Bar Formal Ethics Op.1989–115 IIA–315, IIA–315 (1989) ("*Maxwell* stands for the general proposition that an advance waiver of both conflict of interest and confidentiality protections is not, *per se,* invalid"); *Zador,* 31 Cal.App.4th at 1301, 37 Cal.Rptr.2d 754 (in a situation involving a prospective waiver, "California law does not require that every possible consequence of a conflict be disclosed for a consent to be valid."). The only inquiry that need be made is whether the waiver was fully informed. Cal. Ethics Op. at IIA–316. *See also, e.g.,* ABA Model Rules of Prof. Cond. 1.7(b)(4); Restatement (Third) of the Law Governing Lawyers § 122 (2000) (defining "informed consent" as "requir[ing] that the client or former client have reasonably adequate information about the material risks of such representation to that client or former client"); ABA Formal Op. 93–372 (Apr. 16, 1993); NYCLA Ethics Op. No. 724 at 3 (Jan. 28, 1998). In some circumstances, a second waiver will be warranted, but only if the attorney believes that the first waiver was insufficiently informed. There is no case law requiring a second disclosure in all circumstances for an advance waiver to be valid.

*Zador* does not hold differently. In *Zador,* which also involved Heller, Heller represented both a corporation, Zador, and an agent of the corporation, Kwan, in the same litigation. Kwan agreed to waive any conflict that might arise out of "any adversity" that might develop between Zador and Kwan and to permit Heller to continue representing Zador. Subsequently, a conflict arose between Zador and Kwan. Heller advised Kwan to obtain separate counsel, which he did. Heller also requested that Kwan reaffirm his consent to Heller's continued representation of Zador, which he also did. 31 Cal. App.4th at 1300, 37 Cal.Rptr.2d 754. Zador, represented by Heller, then sued Kwan, and Kwan moved to disqualify.

*Zador* does not in fact require a second consent by a waiving party in First Data's position.[5] *Zador* upheld the validity of the original consent that Kwan signed before Heller discovered the conflict between Zador and Kwan. That consent stated that Kwan would waive any conflicts of interest arising from Heller's continued representation of Zador, "notwithstanding any adversity that may develop." 31 Cal.App.4th at 1300, 37 Cal.Rptr.2d 754. The court found that the phrase "any adversity" clearly contemplated future litigation by Zador against Kwan. *Id.* at 1301–02, 37 Cal.Rptr.2d 754. Kwan was held to have given full and knowing consent to waive conflicts as to future litigation in his first consent. *See also* Cal. Ethics Op.1989–115 at IIA–316 (requiring a second waiver in light of an actual conflict under 3–310(C)(3) only when it becomes clear that the client did not fully understand the first prospective waiver).

### 3. Fully Informed Waiver

A second waiver by First Data in a non-related litigation would only be required if the waiver letter insufficiently disclosed the nature of the conflict that subsequently arose between Visa and First Data. Thus, to prevail on this motion, First Data must show that it was not fully informed about the consequences of its conflicts waiver when it signed the waiver letter. To show full disclosure, Heller must demonstrate that it "communicated information reasonably sufficient to permit the client to appreciate the significance of the matter in question." ABA Formal Op. 93–372 at 29 (citing ABA Model Rules).

An evaluation of whether full disclosure was made and the client made an informed waiver "is obviously a fact-specific inquiry." Cal. Ethics Op.1989–115 at IIA–315. Factors that may be examined include the breadth of the waiver, the temporal scope of the waiver (whether it waived a current conflict or whether it was intended to waive all conflicts in the future), the quality of the conflicts discussion between the attorney and the client, the specificity of the waiver, the nature of the actual conflict (whether the attorney sought to represent both clients in the same dispute or in unrelated disputes), the sophistication of the client, and the interests of justice.[6] *See, e.g., Dept. of Corporations*, 20 Cal.4th at 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371 (listing factors, citations omitted); *Zador*, 31 Cal.App.4th 1285, 37 Cal.Rptr.2d 754; *Image*, 820 F.Supp. 1212; CA. Eth. Op.1989–115; ABA Model Rule 1.7 cmt. 22 (2002); *General Cigar Holdings, Inc. v. Altadis, S.A.*, 144 F.Supp.2d 1334 (S.D.Fla.2001). In evaluating all these factors, there is substantial evidence showing that Heller made a full and reasonable disclosure to First Data and First Data knowingly waived any conflicts con-

---

**5.** *Zador* involved representation of two clients in the same action under sections (1) and (2) of Cal. Rule of Prof. Conduct 3–310, and not section (3). While a second consent is required in that circumstance, a second consent is not required when the dual representation is of two clients in separate matters. Cal. Rule of Prof. Conduct 3–310 discussion § 7 (requiring reaffirmation of consent only when conflict arises between parties in the same litigation).

**6.** Visa and Heller argue that the prejudice to Visa caused by the disqualification of its counsel of choice should be taken into account. The court, however, may not balance Visa's interests against First Data's unless there is a showing that First Data unreasonably delayed bringing this motion for tactical reasons. *Dept. of Corporations*, 20 Cal.4th 1135, 1145 n. 2, 86 Cal.Rptr.2d 816, 980 P.2d 371 (1999); *River West, Inc. v. Nickel*, 188 Cal.App.3d 1297, 1307–09, 234 Cal.Rptr. 33 (1987). The record does not support such a finding here.

cerning Heller's ongoing representation of Visa.

### a. Heller Fully Disclosed the Conflict to First Data.

■ Most significantly, the waiver letter itself demonstrates that Heller fully explained to First Data the nature of the conflict waiver at issue. When First Data first approached Heller to represent it in the patent litigation, Heller explained to First Data that, even though there were no present conflicts between Visa and First Data, there was a significant risk of future adversity because Visa and First Data were major competitors in the processing side of the credit card business. Haslam Decl. ¶ 4. Heller thus informed First Data that it would not be able to take the matter unless First Data would waive any conflicts that might arise out of Heller's ongoing work for Visa in matters up to and including possible future litigation. *Id.* ¶ 3. This understanding was confirmed in the written waiver letter.

> Our engagement by you is also understood as entailing your consent to our representation of our other present or future clients in "transactions," *including litigation* in which we have not been engaged to represent you and in which you have other counsel, and in which one of our other clients would be adverse to you in matters unrelated to those that we are handling for you. In this regard, *we discussed [Heller's] past and on-going representation of Visa U.S.A. and Visa International . . .* in matters which are not currently adverse to First Data. Moreover, as we discussed, we are not

aware of any current adversity between Visa and First Data. Given the nature of our relationship with Visa, however, *we discussed the need for the firm to preserve its ability to represent Visa on matters which may arise in the future including matters adverse to First Data,* provided that we would only undertake such representation of Visa under circumstances in which we do not possess confidential information of yours relating to the transaction . . .

Waiver Letter (emphasis added).

The letter identifies the adverse client, Visa, and discloses as fully as possible the nature of any potential conflict that could arise between the two parties. The letter also clearly states that the waiver contemplates Heller's representation of Visa against First Data in matters "including litigation." [7] First Data was given ample information concerning the conflict in question that it was asked to waive, reviewed this information, and then agreed to the waiver. First Data has failed to demonstrate that it was not fully and reasonably informed when it signed the waiver letter. *See, e.g.,* ABA Formal Op. 93–372 at 1001:177 ("the closer the lawyer who seeks a prospective waiver can get to circumstances where not only the actual adverse client but also the actual potential future dispute are identified," the more likely the prospective waiver is ethically permissible).

The cases where law firms have been disqualified for insufficient disclosures involve situations much more egregious than the facts presented here. For instance, in

---

**7.** The language used by Heller in the First Data letter is in fact more explicit than blanket waivers that have been upheld in similar situations by other courts. *See, e.g., Zador,* 31 Cal.App.4th at 1301, 37 Cal.Rptr.2d 754 (a waiver of conflict with named client "notwithstanding any adversity that may develop" suf-

ficient to bar disqualification in subsequent litigation); *General Cigar,* 144 F.Supp.2d at 1336 (a waiver of conflict with named client "in any matter not substantially related to this representation" sufficient to bar disqualification in subsequent litigation).

*Image,* Kodak successfully disqualified Coudert Brothers, Image's attorneys, from representing Image in that action because Coudert had also represented Kodak in unrelated corporate matters. Kodak produced evidence that Coudert had deliberately misrepresented the scope of their representation of Image to Kodak by downplaying their actual conflict. Specifically, Coudert failed to mention to Kodak's business people that they would be arguing against Kodak before the U.S. Supreme Court in a landmark antitrust case that had been litigated for six years. They also failed to disclose any of this information to Kodak's in-house counsel, and failed to obtain a written consent. After weighing these factors, the court determined that this could not constitute full disclosure and ordered Coudert disqualified. 820 F.Supp. at 1216–17. *See also Florida Insurance Guaranty Assoc. v. Carey Canada, Inc.,* 749 F.Supp. 255, 257 (S.D.Fla. 1990) (a brief paragraph at the end of a letter to a low-level employee that downplayed the law firm's simultaneous representation of 80,000 pending asbestos claims against the client, and the law firm's subsequent failure to notify either general counsel or higher management of the conflict warranted disqualification).

Here, in contrast, Heller notified First Data's director of intellectual property and division general counsel of the potential for a future conflict, fully discussed the nature of that conflict, and informed First Data that Heller would be unable to represent First Data unless the conflict was waived. The facts and law do not support a finding that First Data was not given sufficient information to understand the scope of its waiver. *See also, e.g., Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.,* 142 F.Supp.2d 579, 583 (D.Del.2001) (finding full disclosure and informed consent for prospective waiver when law firm identified existence of potential conflicts, when client independently knew of the possibility of suit on the subject matter in question, and when conflict was discussed between the two parties).

b. Knowing Consent

██ There is also substantial evidence in the record that First Data was aware of this potential conflict with Visa and Heller when it signed the waiver letter, and thus First Data knowingly waived that conflict in order to have Heller to represent it in the patent litigation. First Data in its Answer stated that it had been contemplating its new private arrangement initiative and had given preliminary notice to Visa about it "as early as 1999." First Data Answer ¶¶ 71, 81. In 2000, First Data had also indicated that Visa's business plans concerning private arrangements raised antitrust concerns for the payment-card industry in amicus papers and motions to intervene in the Department of Justice antitrust litigation against Visa. *See* Westrich Decl. Exhs. 2–4 (papers filed by First Data). Visa was represented in that litigation by Heller. *See* Bomse Decl. ¶ 6.

First Data does not deny that it first began contemplating this arrangement in 1999 or that it foresaw antitrust concerns in 2000 over Visa's position on private arrangements. Instead, First Data argues that it did not realize that Heller would represent Visa in those matters and had assumed that Heller would, at most, represent Visa against First Data on incidental matters such as implementation and enforcement of payment processor rules. Marx Decl. ¶¶ 3, 4. First Data admits that it is "unlikely" that such matters would result in litigation with Visa. *Id.* ¶ 5.

This is not credible. Heller informed First Data that it represented Visa in large-scale commercial litigation, and that

due to the nature of the potential conflicts between the two parties, Heller would not be able to represent First Data at all without a broad prospective waiver. Haslam Decl. ¶ 4. First Data had also submitted briefs in high-profile antitrust litigation in which Heller was representing Visa, and where First Data had threatened Visa with further antitrust claims. *See* Westrich Decl. Exhs. First Data knew that Heller was Visa's counsel on major matters that could potentially involve First Data. Given this information, First Data could not have believed that Heller would be uninvolved in any major litigation that could potentially arise between Visa and First Data, or that Visa would have restricted itself to hiring Heller solely for relatively minor regulatory disputes between the two parties.

First Data contended on reply and at the hearing that even if it did know in 2001 when it signed the waiver letter that Visa and First Data could potentially be involved in high-stakes litigation over First Data's private arrangement initiative, First Data had no duty to recognize that conflict on its own. First Data argues that it was instead Visa and Heller's duty to inform First Data of these risks, citing *State Farm Mut. Auto. Ins. Co. v. Federal Insurance Co.,* 72 Cal.App.4th 1422, 1435, 86 Cal.Rptr.2d 20 (1999). In *State Farm,* though, the law firm in question had made no disclosure to the junior client, and then argued that because the two clients were aware of the conflict when the junior client

hired the law firm, they had implicitly consented to a conflict waiver. The court found that the attorneys were still required to disclose the conflict and obtain explicit consent from the clients in that circumstance. *Id.* at 1434–35, 86 Cal. Rptr.2d 20. *See also Blecher & Collins, P.C. v. Northwest Airlines, Inc.,* 858 F.Supp. 1442, 1455 (C.D.Cal.1994) (same; cited in *State Farm*). *State Farm* requires only that the attorneys disclose conflicts to clients in accordance with Cal. Rule of Prof. Conduct 3–310(C). Here, those requirements were met when Heller disclosed the existence of the potential Visa conflict before forming an attorney-client relationship with First Data and obtained a written conflict waiver agreement. No case law allows First Data to ignore its own additional knowledge concerning the nature of the potential conflict when deciding whether to waive.[8]

c.  First Data is a Sophisticated User of Legal Services

▉ In determining whether First Data gave informed consent in the waiver letter, the court may also properly consider First Data's level of experience with legal services. *See, e.g.,* ABA Model Rule 1.7 cmt. 22 (2002) (prospective consent may be acceptable "if client is an experienced user of the legal services involved and is reasonably informed regarding the risk that a conflict may arise"); *General Cigar,* 144 F.Supp.2d at 1339 (finding informed consent when prospective consent

8.  First Data states that its IP counsel does not regularly communicate with other members of its legal department and therefore Visa and Heller should have informed First Data in 2001 that Visa could potentially sue it over the expansion of its private arrangements. At that point, before this suit had been filed, that information was protected under attorney-client and work-product privileges, and Heller would have been prohibited from disclosing it. The main purpose of the conflict waiver

rules is to permit First Data the lawyer of its choice. *See, e.g., Flatt,* 9 Cal.4th at 285 n. 4, 36 Cal.Rptr.2d 537, 885 P.2d 950; *Zador,* 31 Cal.App.4th at 1295, 37 Cal.Rptr.2d 754. It is preferable to require First Data to coordinate communications between attorneys in its 50-person legal department before agreeing to a conflict waiver designed for First Data's benefit rather than force Visa, the senior client, to disclose privileged information or risk losing the lawyers it hired first.

granted by "knowledgeable and sophisticated parties"); Restatement (Third) of the Law Governing Lawyers § 122 cmt. d (prospective waiver acceptable if "client possesses sophistication in the matter in question and has had the opportunity to receive independent legal advice about the consent"); NYCLA Ethics Op. No. 724 (blanket waiver may be permissible, "depending on the client's sophistication, its familiarity with the law firm's [multidisciplinary] practice, and the reasonable expectations of the parties at the time consent is obtained").

First Data is a Fortune 500 company with over $6 billion in annual revenues. *See* Schrader Decl. Exh. A. It is a knowledgeable and sophisticated user of legal services. It has a legal department of about fifty attorneys and routinely hires top-tier national law firms such as Bingham McCutchen, Heller, and Sidley Austin to handle its complex corporate transactions and litigation matters. *See* Schrader Decl. Exhs. B, C. First Data can and should be expected to understand the full extent of what it waived when it signed Heller's explicit waiver letter.

## C. Ethical Walls

■ It is undisputed that Heller immediately put an intra-firm ethical wall in place when Visa sued First Data, which barred contact between the Heller attorneys representing First Data and the Heller attorneys representing Visa. *See* Epsen Decl. ¶ 4, Exh. A. First Data argues that the institution of an ethical wall is insufficient to repair Heller's breach of its duty of loyalty, and that Heller has breached its duty of confidentiality to First Data by its dual representation of Visa and First Data.

Heller conceded at oral argument that if it had breached its duty of loyalty to First Data through its dual representation of Visa and First Data, an ethical wall would not be sufficient to cure the breach. *See*

*William H. Raley Co., Inc. v. Superior Court,* 149 Cal.App.3d 1042, 1049, 197 Cal. Rptr. 232 (1983), *criticized on diff. grounds by River West,* 188 Cal.App.3d at 1308, 234 Cal.Rptr. 33. But Heller did not breach its duty of loyalty to First Data by agreeing to represent Visa in this matter after receiving a valid prospective conflict waiver from First Data. Heller thus is not claiming that the ethical wall is necessary to protect Heller's duty of loyalty to First Data.

Rather, Heller instituted the ethical wall to protect Heller's duty of confidentiality to its client First Data. First Data states that it has shared information concerning its finances and its general business plan to its patent lawyers, and argues that such information is presumed imputed to all Heller attorneys. *See, e.g., Henriksen v. Great American Savings & Loan,* 11 Cal. App.4th 109, 114–15, 14 Cal.Rptr.2d 184 (1992). Heller can rebut that presumption by "showing that effective screening procedures were implemented to prevent the passing of information between the tainted lawyer[s] and other members of the firm." *Panther v. Park,* 101 Cal.App.4th 69, 76, 123 Cal.Rptr.2d 599 (2002). Because First Data makes no showing in its papers beyond the presumption of shared confidentiality in support of its allegations, and because Heller has demonstrated that it immediately put an ethical wall in place as soon as Heller was retained as Visa's counsel in this action, *see* Epsen Decl. Exh. A, there has been no breach of the duty of confidentiality here.

The motion to disqualify Heller is DENIED. This order fully adjudicates the motions listed at 25 and 41 on the clerk's docket for this case.

**IT IS SO ORDERED.**