**CONCAT LP and Chelator, LLC, Plaintiffs,**

**v.**

**UNILEVER, PLC, Unilever N.V., Unilever U.K. Central Resources Ltd., Unilever United States, Inc., and Conopco, Inc., Defendants.**

**No. C 04–1396 SI.**

United States District Court, N.D. California.

Sept. 7, 2004.

Henry M. Heines, April Elizabeth Abele, Paul W. Vapnek, Townsend & Townsend & Crew LLP, San Francisco, CA, for Plaintiffs.

Jason A. Lief, Kenneth L. Waggoner, Michael B. Green, Morgan Lewis & Bockius, LLP, Franklin Brockway Gowdy, Brobeck, Phleger & Harrison LLP, San Francisco, CA, Stephen B. Judlowe, Morgan Lewis & Bockius LLP, New York, NY, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO STAY PENDING ARBITRATION, DENYING DEFENDANTS' MOTION TO DISMISS, AND GRANTING PLAINTIFFS' MOTION TO DISQUALIFY DEFENDANTS' COUNSEL

ILLSTON, District Judge.

On July 2, 2004, this Court heard argument on the following motions: defendants' motion to stay this litigation pending arbitration or, in the alternative, to dismiss the complaint on grounds of *forum non conveniens,* lack of *in personam* jurisdiction, and/or failure to join indispensable parties; and plaintiff's motion to disqualify defendants' counsel. Having carefully considered the argument of counsel and the papers submitted, the Court hereby GRANTS defendants' motion to stay the action pending arbitration; DENIES defendants' motion in the alternative to dismiss; and GRANTS plaintiffs' motion to disqualify counsel.

## BACKGROUND

The dispute in this case is about intellectual property rights concerning a group of chemical compounds and methods of using those compounds in the formulation of deodorants. The compounds in question are chelators. Chelators have the active property of combining with metal ions to form further compounds, known as chelates. Due to their metal-binding properties, chelators tend to inhibit chemical reactions. NIH Unified Medical Language System, U.S. National Medical Library, < *http://ghr.nlm.nih.gov/ghr/glossary/chelator* > (last visited July 1, 2004).

Plaintiff Concat LP is a California Limited Partnership whose partners are members of the Winchell family. Compl. at ¶ 1; Declaration of Dr. H.S. Winchell, ¶ 2. During most of the period covered by this dispute, the managing partner was Dr. H.S. Winchell. Winchell Decl. at ¶¶ 1–2. The current managing partner is a corporation owned by Dr. Winchell's children. *Id.* at ¶ 2. Concat's business includes the design and development of chelators and their applications. Compl. at ¶ 16. Between 1981 and 2001, Concat supported all research and development at Israel Resources Corporation, Ltd. ("IRC"), a private company organized under the law of Israel. IRC assigned all intellectual property rights arising from this research to Concat. Compl. at ¶ 3; Winchell Decl. at ¶ 3. In June, 1996, Concat filed an international patent application covering a number of inventions, including methods of using chelators to prevent bacterial and fungal growth on human body surfaces. Compl. at ¶ 18. On September 10, 2001, Concat assigned all of its then current intellectual property rights to Chelator, LLC, a Delaware limited liability company with its principal place of business in Concord, California. In return, Concat received all Chelator stock issued at that

time. *Id.* at ¶¶ 2, 4. IRC then sold all of its assets, including intellectual property rights, to Complexx R & D services, a private company organized in Israel and wholly owned by Chelator. *Id.* at ¶ 5.

Defendants Conopco, Unilever UK and Unilever U.S. are subsidiaries of Unilever PLC, and Unilever N.V., which are organized under the laws of the U.K. and the Netherlands, respectively, but which operate as a single company and have a single board of directors. Compl. at ¶¶ 7–12. Unilever is a major international producer of consumer goods, including toiletries. *Id.* In August, 1996, Dr. Winchell of Concat and the then president of IRC, Dr. Haim Zaklad, contacted Unilever regarding a possible joint development of Concat's compounds for use in deodorants. Compl. at ¶ 19. On December 12, 1996, a Letter of Understanding was executed between IRC and Unilever U.K. Central Resources Ltd., acting on behalf of its Unilever Research Port Sunlight Laboratory ("Port Sunlight"), located in Wirral, U.K. *Id.;* Decl. of Paul W. Vapnek in Supp. of Pls.' Mot. to Stay or Dismiss, Ex. 5. The 1996 Letter of Understanding was followed by a "Secrecy Agreement," executed in June, 1997, between IRC and the Unilever Research and Engineering Environmental Safety Laboratory ("ESL"), later renamed the Unilever Research SEAC Toxicology Unit ("SEAC"), located in Bedford, U.K. Compl. at ¶ 22; Decl. of Jason Lief in Supp. of Defs.' Mot. to Stay or Dismiss, Ex. B. The scope of the 1997 Secrecy Agreement, which includes an arbitration clause, is a matter in dispute. *See* Lief Decl., Ex. B at ¶ 5. Pursuant to the 1996 Letter of Understanding, IRC provided Unilever with samples of two compounds for evaluation, the more important of which was designated 3MP/IRC011 ("3MP") or Deofix. Compl. at ¶¶ 19–20. Testing and evaluation of the 3MP compound continued for the next several

years, during which period the parties conducted extensive discussions and exchanged scientific data. *Id.* at ¶¶ 21–44. Beginning in May, 1998, Drs. Winchell and Zaklad met and corresponded regularly with Drs. Michael Lowry and Stephen Makin of the Port Sunlight Deodorant Research Group. *Compl.* at ¶¶ 24–44. On February 1, 1999, the IRC and Port Sunlight entered a further "Confidentiality Agreement." *Id.* at ¶ 28; Vapnek Decl. in Supp. of Pls.' Mot. to Stay or Dismiss, Ex. 11.

Beginning in January, 2001, Unilever filed a series of U.S. patent applications under the titles: "Deodorant Products," "Anti–Microbial Compositions," and "Anti–Microbial Antiperspirant Products," all naming Dr. Makin as an inventor. Compl. at ¶¶ 47–52. The "Deodorant Products" application issued in January, 2003, as U.S. Patent Number 6,503,490 B2 ("the '490 patent"). *Id.* at ¶ 47. In April, 2002, Unilever announced a "breakthrough" deodorant technology employing a chemical that inhibits the growth of bacteria by binding the nutrient iron in sweat. *Id.* at ¶ 45. In September, 2002, Drs. Makin and Lowry presented a scientific conference paper entitled "Iron Sequestration on Skin: A New Route to Improved Deodorancy." *Id.* at ¶ 46. Plaintiffs allege that these patent applications and publications are based on data that Unilever obtained from IRS/Concat. *Id.* at ¶¶ 47–50. Plaintiffs further allege that Unilever has marketed deodorants containing plaintiffs' intellectual property. *Id.* at ¶ 54; Winchell Decl. at ¶ 17.

On June 4, 2003, Chelator was awarded U.S. Patent No. 6, 583, 182 B1 ("the '181 patent"), which claims the use of chelating agents to inhibit bacterial and fungal growth. Winchell Decl. at ¶ 16. The inventors of the '181 patent include Drs. Winchell and Zaklad. *Id.*

In late June, 2003, Dr. Winchell and his wife approached W. Scott Thomas, Esq. of the Personal Law Practice Group of the San Francisco office of Morgan, Lewis & Bockius LLP ("Morgan, Lewis") for assistance with planning his estate. Winchell Decl. at ¶ 4; Decl. of W. Scott Thomas in Supp. of Defs.' Opp'n to Pls.' Mot. to Disqualify at ¶ 2. Morgan, Lewis are counsel to Unilever in this dispute. It is undisputed that the Winchells provided Thomas with a list of their and their children's business interests, including their partnership interests in Concat, and Concat's interests in Chelator. Winchell Decl. at ¶ 5; Thomas Decl. at ¶¶ 2–3. Thomas used this information to run a conflict of interest search in Morgan, Lewis's client database. Although Unilever was already an established client of Morgan, Lewis, the search produced a negative result, since no dispute between Unilever and Concat/Chelator existed at that time. Winchell Decl. at ¶ 5; Thomas Decl. at ¶ 5. On July 2, 2003, Thomas sent the Winchells a client-attorney engagement letter, which they executed on July 22 and 23. Winchell Decl., Ex. 1. The engagement letter included the following disclaimer:

> Morgan, Lewis & Bockius is a large law firm, and we represent many other companies and individuals. It is possible that some of our present or future clients will have disputes or other dealings with you during the time that we represent you. Accordingly, as a condition of our undertaking of this matter for you, you agree that Morgan, Lewis & Bockius may continue to represent, or may undertake in the future to represent, existing or new clients in any matter, including litigation, that is not substantially related to our work for you, even if the interests of such clients in those other matters are directly adverse to you. Further, you agree in

light of its general consent to such unrelated conflicting representations, Morgan, Lewis & Bockius will not be required to notify you of each such representation as it arises. We agree, however, that your prospective consent to conflicting representations contained in the preceding sentence shall not apply in any instance where, as the result of our representation of you, we have obtained confidential information of a non-public nature that, if known to another client of ours, could be used to your material disadvantage in a matter in which we represent, or in the future are asked to undertake representation of, that client.

*Id.* at p. 2. Also on July 2, 2003, Dr. Winchell sent Thomas by email a summary of his business interests, which included an initial description of the intellectual property of Concat and Chelator. Winchell Decl. at ¶ 7; Thomas Decl. at ¶ 3. This disclosure was preceded by the following caveat in bold letters:

**THE FOLLOWING INFORMATION IS CONFIDENTIAL AND PROPRIETARY. CONCAT/CHELATOR MAY BE IRREPARABLY HARMED SHOULD THE STATUS OF DEVELOPMENT AND TESTING OF OUR AGENTS BE DISCLOSED TO THOSE DEVELOPING COMPETING TECHNOLOGY, OR THOSE CURRENTLY EVALUATING, OR IN THE FUTURE MAY CONSIDER EVALUATING (sic), OUR AGENTS.**

Winchell Decl., Ex. 2. Dr. Winchell states that, as the estate planning process developed, he provided detailed confidential information about Concat/Chelator's intellectual property and its applications to an intellectual property appraiser recommended by Thomas and directly to Thomas himself. Winchell Decl. at ¶ 8. He also states that he gave Thomas detailed information concerning the business structure, finances and assets of Concat Chelator. *Id.* at ¶ 11. He maintains that these disclosures included matters directly relevant to the current dispute. *Id.* at ¶ 13. Thomas disagrees with this characterization of the information disclosed, which he describes as "quite general and sketchy." Thomas Decl. at ¶ 8. Thomas further states that his work for Dr. Winchell concerned personal financial matters only, that he has no scientific education or experience that would enable him to evaluate Concat/Chelator's intellectual property or its potential commercial applications, and that he has had no discussion on this subject with any member of Morgan, Lewis's New York office, which is representing Unilever in the intellectual property dispute. *Id.* at ¶¶ 6–7, 9.

On August 12, 2003, Chelator's then attorney, Gerald P. Dodson, Esq. of Morrison and Foerster, wrote to Unilever regarding Unilever's allegedly false patents and alleged misappropriation of Concat/Chelator's technology. Winchell Decl., Ex. 3. The letter requested a meeting to discuss correction of the inventorship of Unilever's '490 patent in favor of Drs. Winchell and Zaklad, Concat/Chelator's claim to ownership of the technology, and a possible licensing agreement. *Id.* On October 30, 2003, Unilever notified Dodson that it proposed to hold the meeting at the London offices of Morgan, Lewis, by whom Unilever would be represented. Winchell Decl. at ¶ 20. Dodson was at that time involved in discussions with Morgan, Lewis concerning the possibility of his joining the firm as a partner. *Id.* Believing that these discussions created a potential conflict of interest, Dodson immediately withdrew from representation of Concat/Chelator. *Id.* The proposed meeting was cancelled due to Concat/Chelator's lack of counsel. *Id.* Dodson's negotiations with Morgan, Lewis did not lead to a partnership offer

and ceased as of November, 2003. Decl. of Eric Kraeutler in Supp. of Defs.' Opp'n to Pls.' Mot. to Disqualify at ¶¶ 5–6.

In a letter dated November 24, 2003, plaintiffs' new attorney, Paul W. Vapnek, Esq. of Townsend and Townsend and Crew LLP, informed Morgan, Lewis that Dr. Winchell was a Morgan, Lewis client. Vapnek Decl. in Supp. of Pls.' Mot. to Disqualify, Ex. 7. Vapnek expressed the view that this created a conflict, which "categorically precludes Morgan Lewis from continuing its representation of Unilever adverse to Dr. Winchell and his company." *Id.* In a reply dated December 2, 2003, the Chairman of Morgan, Lewis's Standing Committee on Conflicts and Professional Responsibility rejected this view on the basis of the conflict waiver included in the client-attorney engagement letter signed by Dr. Winchell and his wife. *Id.*, Ex. 8. Morgan, Lewis has stated that, immediately on receipt of Vapnek's letter, they established a *de facto* isolation screen between Thomas's office and the New York attorneys representing Unilever, and that this was subsequently formalized with file access prohibitions and contact prohibitions. Defs.' Opp'n Br. at 10:112–21; Thomas Decl. at ¶ 9; Declaration of Thomas M. Kittredge at ¶ 4.

On April 9, 2004, plaintiffs filed a complaint with this Court asking for correction of the '490 patent to recognize Drs. Winchell and Zaklad as the named inventors of the compounds or, in the alternative, invalidation of the patent. Plaintiffs also seek a declaratory judgment regarding ownership of the subject matter of the '490 patent and the associated patent applications, and allege causes of action for fraud and unfair competition in violation of California Business and Professions Code §§ 17200 and 17500. On May 11, 2004, defendants filed a request for arbitration with the London Court of International Arbitration ("LCIA") pursuant to the arbitration clause contained in the June 1997 Secrecy Agreement. Now before the Court are defendants' motion to stay the suit pending that arbitration or, in the alternative, to dismiss on grounds of *forum non conveniens*, lack of *in personam* jurisdiction, and/or failure to join indispensable parties; and plaintiffs' motion to disqualify Morgan, Lewis as defendants' counsel.

## DISCUSSION

### I. Defendants' motion to stay or dismiss

#### A. Motion to stay pending arbitration

##### 1. Legal standard

Section 4 of the Federal Arbitration Act ("FAA") permits "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States District Court ... for an order directing that ... arbitration proceed in the manner provided for in [the arbitration] agreement." 9 U.S.C. § 4. Upon a showing that a party has failed to comply with a valid arbitration agreement, the court must issue an order compelling arbitration. *Cohen v. Wedbush, Noble Cooke, Inc.*, 841 F.2d 282, 285 (9th Cir.1988).

The Supreme Court has stated that the FAA espouses a general policy favoring arbitration agreements. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Federal courts are required to rigorously enforce an agreement to arbitrate. *Id.* However, the strong presumption in favor of arbitration "does not confer a right to compel arbitration of any dispute at any time." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S.

468, 474, 109 S.Ct. 1248, 1253, 103 L.Ed.2d 488 (1989). This is so because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960); *see also McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 831 (2nd Cir.1988) (stating that the purpose of the FAA is to "make arbitration agreements as enforceable as other contracts, but not more so") (citation omitted). In determining whether to issue an order compelling arbitration, the court may not review the merits of the dispute, but must limit its inquiry into (1) whether the contract containing the arbitration agreement evidences a transaction involving interstate commerce, (2) whether there exists a valid agreement to arbitrate, and (3) whether the dispute(s) fall within the scope of the agreement to arbitrate. *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 477–78 (9th Cir.1991), *cert. denied*, 503 U.S. 919, 112 S.Ct. 1294, 117 L.Ed.2d 516 (1992). If the answer to each of these queries is affirmative, then the court must order the parties to arbitration in accordance with the terms of their agreement. 9 U.S.C. § 4.

■ "When considering a motion to compel arbitration, a court applies a standard similar to the summary judgment standard of Fed.R.Civ.P. 56." *McCarthy v. Providential Corp.*, 1994 WL 387852 at *2, 1994 U.S. Dist. LEXIS 10122 at *6 (N.D.Cal.1994). In considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate was made, a district court should give to the opposing party the benefit of all reasonable doubts and inferences that may arise *Id.*, 1994 WL 387852 at *2, 1994 U.S. Dist. LEXIS 10122 at *6–7 Only when

there is no genuine issue of material fact concerning the formation of an arbitration agreement should a court decide as a matter of law that the parties did or did not enter into such an agreement. *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir.1991).

■ On the other hand, "[t]he standard for demonstrating arbitrability is not a high one; in fact, a district court has little discretion to deny an arbitration motion, since the [Federal Arbitration] Act is phrased in mandatory terms." *Standard Fruit*, 937 F.2d at 475; *cf. Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985) (holding that the Act "leaves no place for the exercise of discretion by a district court"). Moreover, the federal policy favoring arbitration "applies with especial force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 3356, 87 L.Ed.2d 444 (1985). Defendants are thus correct in their assertion that "the clear weight of authority holds that the most minimal indication of the parties' intent to arbitrate must be given full effect, especially in international disputes." *Standard Fruit*, 937 F.2d at 478. Moreover, the scope of an arbitration clause must be interpreted liberally and "as a matter of federal law, any doubts concerning the scope of arbitrable disputes should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24, 103 S.Ct. at 941; *Three Valleys*, 925 F.2d at 1144; *French v. Merrill Lynch*, 784 F.2d 902, 908 (9th Cir.1986). Hence, "[a]n order to arbitrate ... should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United*

*Steelworkers,* 363 U.S. at 582–83, 80 S.Ct. at 1353, 4 L.Ed.2d 1409 (1960).[1]

2. **The subject matter of this dispute is within the scope of the arbitration clause of the 1997 Secrecy Agreement.**

(a) **The transactions covered by the 1997 Secrecy Agreement are not distinct from the matter in dispute.**

■ Defendants have asked this Court to enforce the arbitration clause of the 1997 Secrecy Agreement between IRC and ESL/SEAC, which reads as follows:

5) Any dispute arising out of or in connection with this Agreement which is not settled by the parties amicably shall be referred to and finally resolved by arbitration under the Rules of the London Court of International Arbitration, which Rules are deemed to be incorporated by reference into this Clause. The place of arbitration shall be London and the language, English . . .

6) This Agreement shall be governed by the Law of England.

Lief Decl., Ex. B. Plaintiffs concede the existence of this agreement and the federal policy favoring arbitration. *Dean Witter Reynolds,* 470 U.S. at 218, 105 S.Ct. at 1241; *see* Pls.' Opp'n Br. at 7:6–24. However, they maintain that the 1997 agreement does not apply to the subject matter of this dispute. Pls.' Opp'n Br. at 8:1–9:11. In support of their position, plaintiffs point to the first clause of the Secrecy Agreement, which reads:

1) In consideration of the Disclosing Party disclosing to the Recipients information concerning:—

**Deodorant active 3MP and/or HD2MP**

(hereinafter referred to as "the Information") for health, safety and environmental evaluation purposes, the Recipients undertake for a period of five (5) years from the date of disclosure to treat the Information as strictly confidential and therefore not to disclose it to any third party (except reliable employees, under secrecy obligations, permanently employed in Unilever Research and Engineering and identified by the Head of the Environmental Safety laboratory as essential participants in the health, safety and environmental evaluation process) and to make no commercial use of it without the express consent of the Disclosing Party.

Lief Decl., Ex. B; *cf.* Pls.' Opp'n Br. at 8:14–21. Plaintiffs maintain that the scope of this agreement was limited to IRC's disclosure to one specific Unilever laboratory, ESL/SEAC, for the "health, safety and environmental evaluation purposes" to which the text refers. Pls.' Opp'n Br. at 8:14–9:11. The agreement says nothing about the patents that are the focus of this dispute. *See id.* In oral argument, plaintiffs clarified their position by explaining that they do not allege misuse of the data they submitted to ESL/SEAC. On this basis, plaintiffs assert that the 1997 Secrecy agreement between IRC and ESL/SEAC does not cover the subject matter of this dispute. *See id.* They maintain that the patent infringement and other claims submitted to this Court are all based on alleged misappropriation of other informa-

1. It should perhaps be noted that, in its original context, this statement applied specifically to an arbitration clause of a collective bargaining agreement governed by § 301 of the Labor Management Relations Act, not the Federal Arbitration Act. However, the Supreme Court's citation of the statement in *Mitsubishi Motors,* 473 U.S. at 626, 105 S.Ct. at 3353–54, is indicative of a wider application.

tion that IRC disclosed to the Port Sunlight laboratory under the terms of the December, 1996 Letter of Understanding and the February, 1999 Confidentiality Agreement. *See* Vapnek Decl. in Supp. of Pls.' Opp'n to Defs.' Mot. to Stay or Dismiss, Ex. 5. Neither of these agreements contains an arbitration clause. *See id.* The 1999 Confidentiality Agreement contains a choice of law provision subjecting the agreement to the laws of Israel and the parties to the non-exclusive jurisdiction of the Israeli courts. *Id.*[2] Dr. Stephen Makin, who is named as an inventor of the disputed patents, was employed by Port Sunlight and had extensive dealings with Drs. Winchell and Zaklad of IRC, beginning on or about May 7, 1998. *See* Compl. at ¶ 24.

In support of their position that the 1997 Secrecy Agreement refers to a transaction that was entirely separate from the disclosures giving rise to this dispute, plaintiffs point to correspondence between ESL/SEAC and Drs. Winchell and Zaklad. In a letter covering the 1997 Secrecy Agreement and dated June 4, 1997, the head of ESL, Dr. H.D. Clark, refers to "the care we take over the receipt of confidential information from non-Unilever Companies." Vapnek Decl. in Supp. of Opp'n, Ex. 10.[3] In oral argument, plaintiffs argued that this statement supports of their position that the information they disclosed to ESL/SEAC was quite separate from the information they shared with Port Sunlight. More telling, perhaps, is a letter of February 23, 1999, in which Mary Snow of SEAC requests further informa-

tion regarding the compounds submitted by IRC. Vapnek Decl. in Supp. of Opp'n, Ex. 18. In oral argument, plaintiffs drew attention to the following statement by Snow:

> I recognize that this new request will most likely involve you releasing more detailed information than you had previously provided to my URPS [Port Sunlight] colleagues thus (sic) I would like to reaffirm the statement I made in my previous letter. Detailed manufacture and processing information and safety data sent to us is not passed on to Research or the operating companies. Such information received will only ever be used to help us assess the safety in use of 3MP.

*Id.* at p. 2. Again, plaintiffs submit that this statement confirms their position that the information they submitted to ESL/SEAC is not at issue in this dispute.

In oral argument, defendants maintained that the 1999 Confidentiality Agreement is "not a novation" of the 1997 Secrecy Agreement. In their opinion, the 1999 agreement covered commercial development of the data submitted under the 1997 agreement, which referred to scientific research based on the same data. Defendants therefore argued that the 1999 Confidentiality Agreement is conditioned by the 1997 Secrecy Agreement and characterized the distinction of content proposed by plaintiffs as merely "artful pleading." On this basis, defendants argued that the arbitration provision of the 1997 agreement also controls the 1999 agreement

---

**2.** A further Confidentiality Agreement, between IRC and Unilever U.S., was executed on June 10, 1999. *See* Vapnek Decl. in Supp. of Opp'n, Ex. 11. This agreement parallels the February 1999 agreement between IRC and Port Sunlight in all respects except for its choice of law provision, which specifies New Jersey law and non-exclusive jurisdiction of

the New Jersey courts. The purpose of the agreement is obscure and counsel were not able to explain it during oral argument.

**3.** Confusingly, Dr. Clark refers to the Secrecy Agreement as a "Confidentiality Agreement." However, there is no doubt that the 1997 Secrecy Agreement is the subject of the letter.

and, hence, applies to the subject of this dispute.

Plaintiffs' construction of the historical and legal relationship of these agreements is not without merit, but it has several weaknesses. In the first place, their complaint does not make it clear that the 1997 Secrecy Agreement is unrelated to this dispute; rather, it appears to imply the contrary. *See* Compl. at ¶¶ 21–23. Secondly, plaintiffs themselves show, with supporting evidence, that Unilever and its subsidiaries are, in effect, one homogenous entity and that, in consequence, communication between the member companies and operational units must always be assumed. Pls.' Opp'n Br. at 12:6–12; *see* Vapnek Decl. in Supp. of Opp'n, Ex. 22 at p. 47; *id.*, Ex. 23. Finally, plaintiffs' reconstruction of events requires the Court to accept that all disclosures made by IRC to Port Sunlight prior to the Confidentiality Agreement of February 1, 1999, were governed solely by the December 12, 1996 Letter of Understanding. Plaintiffs have asserted that those disclosures began as early as January 1997 and that Drs. Winchell's and Zaklad's first meeting with Dr. Makin of Port Sunlight occurred on or about May 7, 1998. Compl. at ¶¶ 20, 24. The 1996 Letter of Understanding, which binds IRC for a ninety-day period only, is no more than a preliminary instrument, of very limited scope and duration. The terms of the letter are too sketchy to serve as a basis for any substantial disclosure of scientific data, yet plaintiffs indicate that they made significant disclosures to Port Sunlight during the period prior to February 1, 1999. *See* Compl. at ¶¶ 25–27. On balance, therefore, the record tends to support defendants' contention that the 1997 Secrecy Agreement is an integral part of the series of transactions giving rise to this dispute.

**(b) The language of the arbitration clause is inclusive.**

On the basis of their position regarding the scope of the 1997 Secrecy Agreement, plaintiffs have asked the LCIA to dismiss the arbitration for lack of jurisdiction. *See* Vapnek Decl. in Supp. of Opp'n, Ex. 24 at ¶ 11. The LCIA will make its own determination as to its jurisdiction over this dispute. Under Ninth Circuit law, however, this Court disagrees with plaintiffs' narrow reading of the arbitration clause. In considering the scope of an arbitration clause's application, U.S. courts have recognized a distinction between "broad" and "narrow" language. *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1463–64 (9th Cir.1983); *cf. Tracer Research v. National Environmental Servs.*, 42 F.3d 1292, 1295 (9th Cir. 1994); *see also McDonnell Douglas*, 858 F.2d at 832. The rule is that, where an arbitration clause applies to matters "arising under" the agreement, its scope is narrowly defined, but where it applies to matters "arising out of or relating to" the agreement, its application should be broadly construed. *Mediterranean Enterprises*, 708 F.2d at 1463–64. The arbitration provision at issue covers all disputes "arising out of or in connection with" the 1997 Secrecy Agreement. Lief Decl., Ex. B. Its scope is, therefore, broad. The Court finds that plaintiffs' claims arise "in connection" with the 1997 agreement and are, therefore, subject to the arbitration clause contained therein unless and until the LCIA should decide otherwise.

**(c) In the context of an international dispute, the issue of patent inventorship may be resolved by arbitration.**

During oral argument, the Court posed the question whether the issue of patent inventorship is susceptible of resolution by

arbitration. To this question, defendants answered, "Yes," but plaintiffs answered, "No." Neither party has addressed the question in its written submissions. The question appears to be one of first impression in this Circuit. The Court finds that the law on this subject has until recently been uncertain, but that, in the context of an international dispute, the affirmative answer is correct.

In *Diematic Mfg. Corp. v. Packaging Indus., Inc.*, 381 F.Supp. 1057, 1061 (S.D.N.Y.1974), the court, in considering a dispute that included the issue of inventorship, held that "the grave public interest in questions of patent validity and infringement renders them inappropriate for determination in arbitration proceedings." In reaching that decision, the court relied heavily on *American Safety Equip. v. J.P. Maguire & Co.*, 391 F.2d 821 (2d Cir.1968), where the court reached an analogous decision in the field of Antitrust law. However, in *Mitsubishi Motors*, the Supreme Court held that the *American Safety* ruling does not apply to international disputes, thereby effectively overruling *Diematic*. *Mitsubishi Motors*, 473 U.S. at 632–35, 105 S.Ct. at 3356–3358, 87 L.Ed.2d 444 (1985); *see Warner & Swasey Co. v. Salvagnini Transferica S.p.A.*, 633 F.Supp. 1209, 1212 (W.D.N.Y.1986). The *Diematic* decision, as stated, has also been superceded by federal statute:

> A contract involving a patent or any right under a patent may contain a provision requiring arbitration of any dispute relating to patent validity or infringement arising under the contract. ... Any such provision or agreement shall be valid, irrevocable, and enforceable, except for any grounds that exist at law or in equity for revocation of a contract.

35 U.S.C. § 294(a) 2004; *see Warner & Swasey*, 633 F.Supp. at 1212.

The Court's question raises the possibility that the specific issue of patent inventorship, as distinct from "patent validity or infringement," falls outside the contractual matters covered by this statute, in which case it may be a non-arbitrable issue under U.S. law. However, the *Mitsubishi Motors* decision has established a very strong presumption in favor of arbitration of international disputes, even where U.S. statutory claims are implicated. 473 U.S. at 626–27 and 631, 105 S.Ct. at 3353–34 and 3356. In that case, the Supreme Court held that "the international legal order" requires national courts to "subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration." *Id.*, 473 U.S. at 638–39, 105 S.Ct. at 3360.

In *Miner Enters. v. Adidas AG*, 1995 WL 708570, 1995 U.S. Dist. LEXIS 17822 (N.D.Ill.1995), the court dismissed a complaint involving patent inventorship because it was subject to a transnational arbitration agreement. That court explicitly rejected plaintiffs' argument that U.S. patent law does not permit the issue of inventorship to be arbitrated, holding that there is no authority to support this restrictive reading of 35 U.S.C. § 294(a). *Id.*, 1995 WL 708570 at *2–3, 1995 U.S. Dist. LEXIS 17822 at *7–8. Similarly, in *Danisco A/S v. Novo Nordisk A/S*, 2003 WL 282391, 2003 U.S. Dist LEXIS 1842 (S.D.N.Y.2003), the court granted a stay pending international arbitration of a patent dispute about inventorship of food enzymes. The plaintiffs in that case contended that the issue of inventorship was outside the scope of the arbitration agreement because it was "fundamentally different" from that of ownership. *Id.*, 2003 WL 282391 at *3, 2003 U.S. Dist LEXIS 1842 at *9. The *Danisco* court rejected this contention. *Id.*, 2003 WL 282391 at *3, 2003 U.S. Dist LEXIS 1842 at *10. These

rulings are consistent with the Supreme Court's declared unwillingness "to subvert the spirit" of the United States' accession to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §§ 201–208, "by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so." *Mitsubishi Motors,* 473 U.S. at 639, 105 S.Ct. at 3360.[4]

The great weight of authority thus favors the position that patent inventorship is an arbitrable issue in international disputes. Plaintiffs have not demonstrated that the 1997 agreement does not apply to the subject matter of this dispute. The broad language of the arbitration clause in that agreement indicates strongly that it does. On these grounds, and since doubts are to be resolved in favor of arbitration, defendants' motion to stay this matter pending arbitration must be GRANTED.

### B. Motion to dismiss on grounds of *forum non conveniens*

#### 1. Legal standard

■ *Forum non conveniens* is a common law doctrine, articulated by the U.S. Supreme Court in 1947, allowing a court to decline to exercise its jurisdiction in cases where litigation in the forum would be seriously inconvenient for one of the parties and a more convenient forum is available elsewhere. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 504, 67 S.Ct. 839, 841, 91 L.Ed. 1055 (1947). With regard to transfer of venue between federal courts, the *Gulf Oil* doctrine has been superseded by statute. 28 U.S.C. § 1404(a). However, it remains viable where the alternative forum is abroad. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *cf. Quackenbush v. Allstate Ins.*

*Co.,* 517 U.S. 706, 722, 116 S.Ct. 1712, 1723, 135 L.Ed.2d 1 (1996); *American Dredging Co. v. Miller,* 510 U.S. 443, 449, n. 2, 114 S.Ct. 981, 986, 127 L.Ed.2d 285 (1994); *See* Schwarzer, Tashima & Wagstaffe, Fed. Civ. Proc. Before Trial 4:314 (2001).

Dismissal under *forum non conveniens* requires that an alternative forum be available in the foreign country. *Piper Aircraft,* 454 U.S. at 254, 102 S.Ct. at 265. In addition, a court must balance a number of private and public interest factors. *Ceramic Corp. of America v. Inka Maritime Corp.,* 1 F.3d 947, 949 (9th Cir.1993). Plaintiff's choice of forum will ordinarily prevail, unless those factors strongly favor trial in the foreign country. *Id.* at 950. However, courts should disregard a plaintiff's forum choice where the suit is a result of forum-shopping. *See Alltrade, Inc., v. Uniweld Products, Inc.,* 946 F.2d 622, 628 (9th Cir.1991). The *forum non conveniens* determination ultimately lies in the court's discretion. *Lueck v. Sundstrand Corp.,* 236 F.3d 1137, 1143 (9th Cir. 2001).

#### 2. The doctrine of *forum non conveniens* does not justify dismissal because defendants, by the act of filing U.S. patent applications, have exposed themselves to the foreseeable possibility of litigation in U.S. courts and because the balance of interests does not overcome the presumption in favor of plaintiff's forum choice.

Defendants argue that, under *Gulf Oil,* the Court should exercise its discretion to dismiss this Complaint. Defs.' Br. in Supp. of Mot. to Stay or Dismiss at 15:12–16:24. In cases that concern competing foreign interests, agreements as to forum and choice of law will be upheld by the

---

4. It is not necessary for this Court to reach the question whether the *Miner Enters.* and

*Danisco* decisions would be correct if applied to non-international disputes

courts. *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 518–19, 94 S.Ct. 2449, 2456–57, 41 L.Ed.2d 270 (1974); *Standard Fruit,* 937 F.2d at 478. Defendants argue that this principle applies because the transactions leading to this dispute were between an Israeli company, IRC, and a British one, Unilever U.K. Defs.' Br. in Supp. of Mot. to Stay or Dismiss at 16:17–18. They maintain that forcing them to litigate in California would be vexatious and oppressive, because "no Unilever defendant could reasonably have anticipated being hauled into court in this state." *Id.* 16:8–20 (citing to *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297–298, 100 S.Ct. 559, 567–68, 62 L.Ed.2d 490 (1980), where the Court rejected the theory that, because it was foreseeable that a car sold by a dealer would be driven to a state where the dealer did no business, the dealer could be sued in that state). However, plaintiffs have challenged a U.S. patent and several U.S. patent applications filed by and through Unilever U.S. Compl. at ¶¶ 47–50. The possibility that Unilever might be called to account for those applications under U.S. law was not unforeseeable.

For this reason, the Court does not accept defendants' characterization of the dispute as between foreign interests only. The plaintiff companies are based in California and two of the defendant companies, Conopco and Unilever U.S., are incorporated in the United States. Compl. at ¶¶ 1–2, 11–12. On a motion to dismiss for *forum non conveniens,* the moving party has the burden and must make "a clear showing of facts which establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Ravelo Monegro v. Rosa,* 211 F.3d 509, 514 (9th Cir.2000); *cf. Baris v. Sulpicio Lines, Inc.,* 932 F.2d 1540, 1549 (5th Cir.1991). The Court is not persuad-

ed that the inconvenience of this forum to Unilever, a multinational company doing business in the United States and selling its products in California, outweighs the inconvenience to the much smaller plaintiff companies if a foreign forum is imposed. Nor does the Court see any public interest factor which would overcome the presumption that plaintiffs' choice of forum will prevail. *Ceramic Corp. of America,* 1 F.3d at 950. Defendants' motion that this Court should decline to exercise its jurisdiction is, therefore, DENIED.

### C. Motion to dismiss for lack of *in personam* jurisdiction

#### 1. Legal standard

A court may only exercise jurisdiction over an out-of-state defendant if the defendant is amenable to service of process under the forum's long-arm statute and if the exercise of jurisdiction over the defendant would not violate the Due Process Clause of the Fifth and Fourteenth Amendments. *Omni Capital Intern. Ltd. v. Rudolf Wolff & Co. Ltd.,* 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). There are two bases upon which the court may exercise jurisdiction over a defendant in a diversity case under the Due Process Clause. First, there is general jurisdiction, which arises in cases in which a defendant's "continuous and systematic" contacts within the forum state renders that defendant amenable to suit in any lawsuit brought against it in the forum state. *Nationwide Mutual Ins. Co. v. Tryg Intern. Ins. Co.,* 91 F.3d 790, 793 (6th Cir.1996). Second is specific jurisdiction, which exists in cases in which the subject matter of the lawsuit arises out of or is related to the defendant's contacts with the forum. *Id.*

In any action, a basis of *in personam* jurisdiction must exist for each defendant. Fed.R.Civ.P.12(b)(2). If challenged, the plaintiff has the burden of establishing a district court's personal jurisdiction over

the defendants. *Doe I v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir.2001) (per curiam). However, a district court should not act on the defendant's motion to dismiss without first holding an evidentiary hearing. *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.,* 328 F.3d 1122, 1128–1129 (9th Cir.2003). Therefore, the plaintiff need only make a *prima facie* showing of jurisdiction to avoid the defendant's motion to dismiss. *Id.; cf. Data Disc, Inc. v. Systems Tech. Assocs., Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977). Unless directly contravened, plaintiffs' version of the facts is taken as true, and "conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiffs'] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists." *Unocal,* 248 F.3d at 922 (quoting *AT & T v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996)); *see also Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1087 (9th Cir.2000) (holding that "[b]ecause the *prima facie* jurisdictional analysis requires us to accept the plaintiff's allegations as true, we must adopt [plaintiff]'s version of events for purposes of this appeal").

Personal jurisdiction over a nonresident defendant may exist if the defendant has either a continuous and systematic presence in the state or minimum contacts with the forum state such that the exercise of jurisdiction "does not offend traditional notions of fair play and justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

**2. Defendants' motion to dismiss for lack of *in personam* jurisdiction fails because plaintiffs have made a *prima facie* showing that Unilever's parent companies and foreign subsidiaries are within the jurisdiction of the Court.**

▪ Relying on *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925) and its progeny, defendants submit that this Court does not have *in personam* jurisdiction over Unilever's parent corporations and foreign subsidiaries. Defs.' Br. in Supp. of Mot. to Stay or Dismiss at 17:19–18:2. In *Cannon,* the Court held that a Maine corporation was not present for purposes of service or jurisdiction in North Carolina, despite its domination of a subsidiary doing business in that state. However, the *Cannon* analysis was based on the "presence" test established in *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1877). *Cannon,* 267 U.S. at 336–37, 45 S.Ct. at 251. In *International Shoe,* the Supreme Court replaced *Pennoyer's* "presence" test with a "minimum contacts" standard. 326 U.S. at 318–20, 66 S.Ct. at 159–160. As a result, *Cannon's* continued viability has been questioned. *See Avery Dennison Corp. v. UCB SA,* 1997 U.S. Dist. LEXIS 2931, *7–8 (D.Ill. 1997).

Defendants are, nonetheless, correct in their assertion that the existence of a relationship between a parent company and its subsidiaries is not in itself sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum. *Transure, Inc. v. Marsh and McLennan, Inc.,* 766 F.2d 1297, 1299 (9th Cir.1985). On the other hand, if the parent and subsidiary are not really separate entities, or one acts as an agent of the other, the local subsidiary's contacts with the forum may be imputed to the foreign parent corporation. *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 676 (D.C.Cir.1996). An alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations. *Doe I v. Unocal Corp.,* 248 F.3d 915, 925–926 (9th Cir. 2001); *Kramer Motors, Inc. v. British*

*Leyland, Ltd.,* 628 F.2d 1175, 1177 (9th Cir.1980). "Typically, the courts find jurisdiction over the parent in two situations: 1) where the subsidiary is acting on behalf of or at the direction of the absent parent, i.e., as the parent's agent, and 2) where the degree of relationship between the parent and the subsidiary is so significant that it justifies the exercise of jurisdiction." *Avery Dennison,* 1997 U.S. Dist. LEXIS 2931 at *8–9.

Defendants contend that "[t]here is no fact and no act of commission in the Complaint which is in any way said to have been committed by Unilever PLC, Unilever N.V. and/or Unilever United States, Inc." Defs.' Br. in Supp. of Mot. to Stay or Dismiss at 17:2–4. This is not accurate. In the first place, defendants omit to mention the June 1999 Confidentiality Agreement between IRC and Unilever Research U.S. Vapnek Decl. in Supp. of Opp'n, Ex. 11. Second, plaintiffs allege that Unilever U.S. improperly filed patent applications incorporating plaintiffs' intellectual property, and that it did so at the behest of one or both of the two parent companies, Unilever PLC and/or Unilever N.V. Compl. at ¶¶ 47–50. Defendants further argue that Unilever U.K. Central Resources Ltd. is beyond the jurisdiction of this Court because it is not alleged to do business in the United States or to have committed any specific act in the United States or California associated with any cause of action in the Complaint. Defs.' Br. in Supp. of Mot. to Stay or Dismiss at 17:4–6. Plaintiffs, however, allege that the British subsidiary is the source of the misappropriated intellectual property contained in the U.S. patents. Compl. at ¶¶ 47–50. It is undisputed that an employee of Unilever U.K. Central Resources Ltd., Dr. Stephen Makin, is a named inventor of the contested '490 patent and the other U.S. patent applications, and that

Dr. Makin had extensive contact with Dr. Winchell. *Id.*

To establish a *prima facie* case, plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant. *Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir.1995). The evidence produced by Concat/Chelator meets this standard. Unilever's own literature explains that the companies within the group act as "a single entity with a single management team," that they co-operate in all areas, and—of signal importance—that they exchange all relevant business information. Pls.' Opp'n Br. at 12:6–12; Vapnek Decl. in Supp. of Opp'n, Ex. 22 at p. 47; *id.,* Ex. 23. On this basis, the Court finds, *prima facie,* that defendant companies are within the scope of its specific jurisdiction.

**D. Motion to dismiss for failure to join indispensable parties**

**1. Legal standard**

██ A person claiming an interest in the subject of a civil action shall, if subject to service and unless joinder of the person would deprive the court of jurisdiction, be joined to the action if those already parties cannot be accorded complete relief in the person's absence, or if the person's interest in the matter may be prejudiced by the outcome, or if non-joinder of the person would expose another party to a substantial risk of multiple or inconsistent obligations. Fed.R.Civ.P. 19(a). If the person has not been joined, the court shall order that the person be made a party. *Id.* Such a person is considered a "necessary" party to the action. *Temple v. Synthes Corp.,* 498 U.S. 5, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990). If the person cannot be joined, the court must determine whether "equity and good conscience" will permit the action to proceed. Fed. R.Civ.P. 19(a). If not, the person is considered to be an "indispensable" party to

the action. *Id.; Temple,* 498 U.S. at 7, 111 S.Ct. at 316. *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 118–19, 88 S.Ct. 733, 742–43, 19 L.Ed.2d 936 (1968). A litigation must be dismissed if an indispensable party cannot be joined. Fed.R.Civ.P. 12(b)(7).

Determination of this issue thus proceeds by a two-part inquiry. When a court has found that a party is "necessary" and should be joined "if feasible," but that joinder is not possible, it must then decide whether to dismiss or to proceed without that party. *Provident Tradesmens Bank,* 390 U.S. at 118–19, 88 S.Ct. at 742–43. Thus, the decision to proceed is a decision that the absent person is merely "necessary" while the decision to dismiss is a decision that the person is "indispensable." *Id.* The decision whether to dismiss on grounds of indispensability is highly case-specific, involving a balancing of substantive and procedural factors. *Id.* Thus, a court does not know whether a particular person is "indispensable" until it has examined the situation to determine whether it can proceed without him. *Id.; cf. United States ex rel. Morongo Band of Mission Indians v. Rose,* 34 F.3d 901, 907 (9th Cir.1994).

2. **Defendants have not shown that IRC and/or Complexx are indispensable parties to this litigation because the facts that plaintiffs must prove to prevail would negate or greatly mitigate any prejudicial effect of their non-joinder.**

Defendants contend that IRC, the only party with whom Unilever had formal dealings, and its alleged successor in interest, Complexx, are necessary and indispensable parties to this litigation. Defs.' Br. in Supp. of Mot. to Stay or Dismiss at 19:15–10. It is true that the agreements at issue were executed in the name of IRC alone. Lief Decl., Ex. A; Vapnek Decl. in Supp. of Opp'n, Ex. 24, Annex 3. It is also true that "in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." *Virginia Surety Co. v. Northrop Grumman Corp.,* 144 F.3d 1243, 1248 (9th Cir.1998); *cf. Lomayaktewa v. Hathaway,* 520 F.2d 1324, 1325 (9th Cir. 1975). However, plaintiffs have not asserted a breach of contract claim. Their Complaint alleges patent infringement, misappropriation of intellectual property, fraud and unfair competition. *See* Compl. at ¶¶ 55–83. The action therefore sounds in tort.

Defendants question Concat/Chelator's claim to be the assignee of IRC's intellectual property. Defs.' Opp'n Br. at 19:15–19, 25–26. They further argue that the uncertainty of Concat/Chelator's claim to title to the intellectual property at issue exposes Unilever to the risk of multiple suits in a variety of jurisdictions on the same matter. *Id.* 19:26–20:10. This is a legitimate concern, especially since plaintiffs have yet to produce any evidence of the alleged assignment of IRC's intellectual property rights to Concat/Chelator, or of the alleged parent-subsidiary relationship between the U.S. and Israeli companies. Unless they can prove these allegations at trial, plaintiffs will not prevail.

Nonetheless, the facts if as alleged appear to justify Concat/Chelator's claim that it is able to adequately represent any residual interest IRC and/or Complexx may have in this matter. Pls.' Opp'n Br. at 13:14–20. A future suit by IRC and/or Complexx against Unilever will be precluded if plaintiffs' control of those companies is established. The Court notes that plaintiffs have petitioned for correction of inventorship of the disputed patents to include both Dr. Winchell of Concat/Chelator

and Dr. Zaklad of IRC. Compl. at ¶¶ 55–83. Moreover, the Court is required to consider the extent to which any prejudice to defendants may be lessened "by protective provisions in the judgement, by the shaping of relief, or other measures." Fed.R.Civ.P. 19(b). If necessary, the adjudication of this dispute could be tailored to mitigate Unilever's exposure to further suit by limiting damages or by requiring Concat/Chelator to indemnify Unilever in whole or in part against future claims by the parties in question.

For these reasons, the Court finds that defendants have not shown that IRC or Complexx are indispensable parties to this action and their motion for dismissal on this basis is DENIED.

## II. Plaintiffs' motion for disqualification of defendants' counsel

### A. Legal standard

#### 1. Disqualification generally

■ Whether to disqualify counsel is a decision conveyed to the discretion of the district court. See Gas–A–Tron of Ariz. v. Union Oil Co. of Calif., 534 F.2d 1322, 1325 (9th Cir.1976). Pursuant to Local Rule 11, every attorney before this Court must "comply with the standards of professional conduct required of the members of the State Bar of California." N.D. Cal. Civ. Local Rule 11–4(a)(1). Accordingly, the Court applies California law in this matter. Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co., 264 F.Supp.2d 914 (N.D.Cal.2003); see also Asyst Technologies v. Empak, Inc., 962 F.Supp. 1241, 1242 (N.D.Cal.1997); Elan Transdermal Ltd. v. Cygnus Therapeutic Systems, 809 F.Supp. 1383, 1387 (N.D.Cal. 1992).

■ Because disqualification is a drastic measure, it is generally disfavored and should only be imposed when absolutely necessary. See Alexander v. Primerica Holdings, Inc., 822 F.Supp. 1099, 1114 (D.N.J.1993); United States ex rel. Lord Electric Co. v. Titan Pac. Constr. Corp., 637 F.Supp. 1556, 1562 (W.D.Wash.1986). When deciding whether disqualification is warranted, "[t]he court must weigh the combined effect of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest." Allen v. Academic Games Leagues of Am., 831 F.Supp. 785, 789 (C.D.Cal.1993) (citing In re Lee G., 1 Cal.App.4th 17, 1 Cal.Rptr.2d 375, 380 (1991)); see also Lord Electric, 637 F.Supp. at 1562. Because a motion to disqualify is often tactically motivated and can be disruptive to the litigation process, it is a drastic measure that is generally disfavored. Visa U.S.A., Inc. v. First Data Corp., 241 F.Supp.2d 1100, 1104 (N.D.Cal.2003); cf. Certain Underwriters, 264 F.Supp.2d at 918. On the other hand, however, "the paramount concern must be the preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar." State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co., 72 Cal.App.4th 1422, 86 Cal.Rptr.2d 20, 24 (1999). In Snider v. Superior Court, 113 Cal.App.4th 1187, 7 Cal.Rptr.3d 119, 125 (2003), the court explained that it was important to have a bright-line test to determine the ethical boundaries of an attorney's conduct. "Otherwise, an attorney would be uncertain whether the rules had been violated until . . . he or she is disqualified. Unclear rules risk blunting an advocate's zealous representation of a client." Id. (quoting Nalian Truck Lines, Inc. v. Nakano Warehouse & Transp. Corp., 6

Cal.App.4th 1256, 8 Cal.Rptr.2d 467, 472 (1992)); *cf. Crenshaw v. Mony Life Ins. Co.,* 318 F.Supp.2d 1015, 1019–20 (S.D.Cal. 2004).

### 2. Concurrent representation

This issue is governed by Rule 3–310 of the California Rules of Professional Conduct, which states:

> (C) A member shall not, without the informed written consent of each client: (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter . . . .

> \* \* \* \* \* \*

> (E) A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

Cal. Rules of Prof'l Conduct 3–310. Rule 3–310 prohibits representation of clients whose interests are adverse unless both clients give their informed consent. *Certain Underwriters,* 264 F.Supp.2d at 918–19; *Visa,* 241 F.Supp.2d at 1104; *Flatt v. Superior Court,* 9 Cal.4th 275, 36 Cal. Rptr.2d 537, 885 P.2d 950, 956 n. 4 (1994); *Truck Ins. Exch. v. Fireman's Fund Ins. Co.,* 6 Cal.App.4th 1050, 8 Cal.Rptr.2d 228, 231 (1992). The prohibition applies even if the two disputes are unrelated. *Flatt,* 36 Cal.Rptr.2d 537, 885 P.2d at 955 (holding

that "[e]ven though the simultaneous representations may have *nothing* in common, and there is *no* risk that confidences to which counsel is a party in the one case have any relation to the other matter, disqualification may nevertheless be *required*") (emphasis in original). The reason for the prohibition is "the attorney's duty—and the client's legitimate expectation—of *loyalty,* rather than confidentiality." *Id.* (emphasis in original); *cf. Certain Underwriters,* 264 F.Supp.2d at 919; *Mindscape, Inc. v. Media Depot, Inc.,* 973 F.Supp. 1130, 1132–33 (N.D.Cal.1997); *Forrest v. Baeza,* 58 Cal.App.4th 65, 67 Cal.Rptr.2d 857, 862 (1997) (holding that "[t]he strict proscription against dual representation of clients with adverse interests . . . derives from a concern with protecting the integrity of the attorney-client relationship rather than from concerns with the risk of specific acts of disloyalty or diminution of the quality of the attorney's representation"); *Truck Ins. Exchange,* 8 Cal.Rptr.2d at 232 (stating that "[i]f this duty of undivided loyalty is violated, 'public confidence in the legal profession and the judicial process' is undermined.") (citing *In Re Yarn Processing Patent Validity Litigation,* 530 F.2d 83, 89 (5th Cir.1976)). In *Unified Sewerage Agency v. Jelco Inc.,* 646 F.2d 1339, 1345 (9th Cir.1981), the court held that "disqualification of a law firm based upon representation of a client in a lawsuit against an existing client requires no showing of specific 'adverse effect' resulting from such representation."

**B. The Court's decision to stay this suit pending arbitration in another forum does not moot plaintiffs' motion to disqualify counsel because there is a substantial likelihood of further proceedings in the federal courts.**

Defendants argue that, having granted their motion to stay this litigation

pending arbitration in London, the Court should dismiss plaintiffs' motion for disqualification of counsel as moot. Defs.' Opp'n Br. at 4:13–22. A federal district court in southern California, faced with facially similar facts and issues, has adopted this course. *Richards v. Lloyd's of London,* 1995 U.S. Dist. LEXIS 6888, Fed.Sec.L.Rep.(CCH) ¶ 98,801, 1995 WL 465687 (S.D.Cal.1995), *aff'd en banc with regard to enforcement of forum agreement only,* 135 F.3d 1289 (9th Cir.1998), *cert. denied* 525 U.S. 943, 119 S.Ct. 365, 142 L.Ed.2d 301 (1998). In that case, however, the court, having found that a wholly unambiguous forum choice clause was enforceable, dismissed the case and thereby relinquished its jurisdiction. 1995 WL 465687 at *10, 1995 U.S. Dist. LEXIS 6888 at *42. This Court has not done so and further litigation in this forum is, therefore, possible.

The Court recognizes that its determination of this matter will have no force outside of its jurisdiction and that the LCIA will apply its own conflict rules. However, plaintiffs may seek leave to appeal this Court's decision to stay the action or, at a later date, petition this Court for review of an arbitral decision. It is also possible that the LCIA will grant plaintiffs' motion to dismiss the arbitration. *See* Vapnek Decl. in Supp. of Opp'n, Ex. 24. The Court therefore finds that, because there is a substantial likelihood of further proceedings within this jurisdiction, the issue of disqualification of counsel remains the subject of a live controversy. *See City of Erie v. Pap's A.M.,* 529 U.S. 277, 288, 120 S.Ct. 1382, 1391, 146 L.Ed.2d 265 (2000) (holding that "[o]ur interest in preventing litigants from attempting to manipulate the Court's jurisdiction to insulate a favorable decision from review ... counsels against a finding of mootness here").

**C. Dodson's preliminary employment discussions with Morgan, Lewis do not justify disqualification of Morgan, Lewis because the duty of client confidentiality applied to those discussions and there is no evidence that a breach occurred.**

 Plaintiffs' motion to disqualify Morgan, Lewis has two factual bases, each of which requires separate consideration. First, plaintiffs allege a conflict of interest arising from the preliminary employment discussions between Morgan, Lewis and plaintiffs' erstwhile attorney, Dodson. Pls.' Br. in Supp. of Mot. to Disqualify at 10:12–26. Discussions of this nature are covered by the attorney's duty of client confidentiality. *People v. SpeeDee Oil Change Systems, Inc.,* 20 Cal.4th 1135, 86 Cal.Rptr.2d 816, 980 P.2d 371, 378–79 (1999). For Dodson to share confidential information about Concat/Chelator with Morgan, Lewis would be a grave violation of that duty, even if he had no knowledge of a dispute. However, the record contains no evidence of any such improper disclosure. Plaintiffs state that Dodson withdrew his representation immediately upon discovering that Unilever was Morgan, Lewis' client. Pls.' Br. in Supp. of Mot. to Disqualify at 10:12–14; *cf.* Winchell Decl. at ¶ 20. Discussions between Dodson and Morgan, Lewis were discontinued at the same time. Kraeutler Decl. at ¶¶ 5–6. However, these observations do not dispose of the issue entirely. The following Opinion of the American Bar Association, cited by defendants, Opp'n Br. at 11:14–15, turns out to be less than wholly favorable to their position:

A lawyer's pursuit of employment with a firm or party that he is opposing in a matter may materially limit his representation of his client, in violation of Model Rule 1.7(b). Therefore, the lawyer must consult with his client and obtain the client's consent before that

point in the discussions when such discussions are reasonably likely to materially interfere with the lawyer's professional judgment.... Generally, the time for consultation and consent will be the time at which the lawyer agrees to engage in substantive discussions of his experience, clients, or business potential, or the terms of a possible association, with the opposing firm or party. If client consent is not given, the lawyer may not pursue such discussions unless he is permitted to withdraw from the matter.... Lawyers in the law firm negotiating with the lawyer also have a conflict, requiring similar action to resolve, if their becoming associated with the lawyer would cause their firm's disqualification, or if the interest of any of those lawyers in the job-seeking lawyer's becoming associated with the firm may materially limit their representation of a client adverse to the job-seeking lawyer. "Job Negotiations with Adverse Firm or Party," ABA Formal Op. 96–400 (January 24, 1996), http://www.abanet.org/cpr/ ethicsearch/96400.html (last visited July 1, 2004). No direct testimony regarding Dobson's reasons for his decision to withdraw from representation of Concat/Chelator is at present before the court. Nonetheless, the fact that he did so gives rise to the reasonable, if circumstantial, inference that he believed his negotiations with Morgan, Lewis had reached, or were approaching, the stage of "substantive discussions" at which a conflict would arise.[5] Morgan,

Lewis deny that this was so and state that the discussions never passed the preliminary stage. Defs.' Opp'n Br. at 3:16–22, 11:6–10; Kraeutler Decl. at ¶¶ 2–6.

In oral argument, plaintiffs pointed to an email dated November 14, 2003, from Stephen Judlowe of Morgan, Lewis to Vapnek's partner, Henry Heines. Vapnek Decl. in Supp. of Pls.' Mot. to Disqualify, Ex. 6. Plaintiffs drew attention to Judlowe's statement that Morgan, Lewis had disclosed the discussions to Unilever and obtained Unilever's informed consent to proceed. *Id.* Judlowe further stated: "Morgan Lewis has received no information of any kind from Mr. Dobson about this matter, other than to identify the existing adversity between Unilever and Winchell/Chelator and to discuss scheduling of the proposed meeting in the United Kingdom." *Id.* Plaintiffs interpreted this as meaning that Morgan, Lewis was aware of the conflict during the time when it was conducting partnership discussions with Dobson. The Court finds that the evidence will not bear this weight. The meeting to which Judlowe refers was to have been held at Morgan, Lewis's London offices. Dobson only became aware of the conflict when Unilever proposed this meeting. Pls.' Br. in Supp. of Mot. to Disqualify at 10:12–18. Plaintiffs infer that the disclosure to which Judlowe refers occurred before these events, but there is no evidence that Morgan, Lewis or Unilever

---

**5.** However, ABA Formal Op. 96–400 would only prohibit Dodson from continuing his discussions with Morgan, Lewis without first obtaining the permission of Concat/Chelator. It would not require him to unilaterally withdraw from representation of Concat/Chelator. The ethical basis of his decision is, therefore, unclear. *See Stanley v. Richmond*, 35 Cal. App.4th 1070, 41 Cal.Rptr.2d 768, 775 (1995) (holding that, where an attorney has *accepted* employment with a firm representing a party

adverse to her client without first having obtained the client's permission, the attorney has a duty to withdraw as soon as practical, but only after taking "reasonable steps to avoid foreseeable prejudice to the rights of [her] client, including giving due notice to [the] client [and] allowing time for employment of other counsel") (citing Cal. Rules of Prof'l Conduct, Former Rule 2–111; *cf.* Rule 3–700(A)(1)(2)).

knew about the conflict before Dobson became aware of it.

On the present record, the Court finds that, with regard to this issue, Concat/Chelator has not met the burden of proof required for disqualification of counsel. In the absence of evidence of disclosure of confidential information, the fact that Dobson is no longer Concat/Chelator's attorney has removed any potential conflict and the issue is, therefore, moot.

**D. Disqualification of Morgan, Lewis is required by law because the firm's concurrent attorney-client relationships with Unilever and Dr. Winchell breach the attorney's duty of loyalty to client, not confidentiality.**

**1. Concat/Chelator has standing to raise the issue of disqualification because Dr. Winchell has an ownership interest in Concat/Chelator and was formerly an owner of IRC; because, at the time when he consulted Morgan, Lewis, he was the managing partner of Concat/Chelator; and because he played a leading role in IRC's and Concat/Chelator's dealings with Unilever.**

■ Defendants argue that, if Dobson's relationship with Morgan, Lewis is set aside, Concat/Chelator has no standing to raise the issue of disqualification, because neither company is, or has ever been, a client of Morgan, Lewis, and Dr. Winchell is not a party to this dispute. Defs.' Opp'n Br. at 4:25–5:8. It is true that, "as a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification." *Kasza v. Browner*, 133 F.3d 1159, 1171 (9th Cir. 1998) (quoting *United States v. Rogers*, 9 F.3d 1025, 1031 (2d Cir.1993) (quoting, in

turn, *Yarn Processing*, 530 F.2d at 88)). However, courts have found that non-client litigants may have standing to move for disqualification of counsel in cases where they have a sufficient "personal stake" in the motion because "the ethical breach so infects the litigation in which disqualification is sought that it impacts the moving party's interest in a just and lawful determination of her claims." *Colyer v. Smith*, 50 F.Supp.2d 966, 971 (C.D.Cal.1999); *cf. Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789 (9th Cir.1999) (stating that "[o]rdinarily, to prove an injury in fact under Article III of the Constitution, the plaintiff need only allege an injury that is 'fairly traceable' to the wrongful conduct") (quoting *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 642 n. 2 (2d Cir.1988)); *Metro–Goldwyn–Mayer v. Tracinda Corp.*, 36 Cal.App.4th 1832, 43 Cal.Rptr.2d 327, 335 (1995) (holding that disqualification is appropriate where counsel's employment is adverse to the client or former client, even though the prior client is not a party to the litigation). The circumstances of the present case conform to these conditions.

■ Defendants initially questioned Dr. Winchell's interest in Concat/Chelator. Defs.' Opp'n Br. at 4:25–28. On this basis, they challenged Concat/Chelator's standing to bring this motion since Dr. Winchell is not a party to the litigation and Concat/Chelator is not and has never been a client of Morgan, Lewis. *Id.* at 5:1–7:18. At oral argument and subsequently, plaintiffs have declared that Dr. Winchell and his wife own a 24% limited partnership interest in Concat, which is the sole owner of Chelator, and that Dr. Winchell was the majority stockholder and board Chairman of IRC. Winchell Supplemental Decl. in Supp. of Pls.' Mot. to Disqualify at 2:4–25. It is undisputed that, during the period covered by this dispute, Dr. Winchell was Concat's managing partner and that he

played a leading role in the negotiations and scientific discussions between IRC and Unilever. Compl. at ¶¶ 19–44.

Defendants now accept the fact of Dr. Winchell's ownership interest in Concat/Chelator but maintain that "the case law overwhelmingly requires the client to bring the Motion to Disqualify—not a third party, even if there is an ownership connection." Letter of James N. Penrod dated July 7, 2004 at p. 3. It is true that, in order to establish Article III standing, a party must show that it has personally suffered an "injury in fact" which is causally related to the conduct at issue. *Colyer,* 50 F.Supp.2d at 968 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992)). Defendants' position is that nonparty Winchell did not disclose any confidential information about Concat/Chelator to Thomas of Morgan, Lewis and, therefore, no "injury in fact" has occurred. Defs.' Opp'n Br. at 7:1–18; Penrod letter at 1–3. However, defendants invoke the "substantially related" standard, which is applicable to former, not concurrent, client relationships. Defs., Opp'n Br. at 6:4–8; *but see Yarn Processing,* 530 F.2d at 89. Moreover, the prohibition against concurrent adverse representation is based on the duty of loyalty, not confidentiality. Even in cases involving prior relationships with non-parties, courts have recognized a variety of circumstances under which disqualification is required. *Thomas v. Municipal Court of Antelope Valley J.D.,* 878 F.2d 285 (9th Cir.1989); *Hull v. Celanese Corp.* 513 F.2d 568, 569 (2d Cir.1975); *Leversen v. Superior Court,* 34 Cal.3d 530, 194 Cal.Rptr. 448, 668 P.2d 755 (1983); *Comden v. Superior Court,* 20 Cal.3d 906, 145 Cal.Rptr. 9, 576 P.2d 971 (1978); *Metro–Goldwyn–Mayer,* 43 Cal.Rptr.2d at 335; *William H. Raley Co. v. Superior Court,* 149 Cal.App.3d 1042, 197 Cal.Rptr. 232 (1983); *Jeffry v. Pounds,* 67 Cal.App.3d 6, 136 Cal.Rptr. 373 (1977).

In light of the much stricter standard applying to conflicts arising from concurrent representation, the Court agrees with plaintiffs that Dr. Winchell's disclosures to Thomas of Morgan, Lewis were not merely of a private nature, since they were inextricably intertwined with the business and financial matters of Concat/Chelator. Pls.' Br. in Supp. of Mot. to Disqualify at 6:25–28; Pls.' Reply at 4:6–8. This fact gives Concat/Chelator standing. *See Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir.1973) (granting motion to disqualify made by the corporation which the former client controlled).[6]

2. **The advance waiver signed by Dr. Winchell is insufficient to establish informed consent owing to its very general nature and because Morgan, Lewis failed in its obligation to request a further waiver when it discovered the dispute between Unilever and Concat/Chelator.**

"When evaluating whether a law firm may concurrently represent two clients, even on unrelated matters, it is presumed that the duty of loyalty has been breached and counsel is automatically disqualified." *Visa,* 241 F.Supp.2d at 1104; *cf. Flatt,* 36 Cal.Rptr.2d 537, 885 P.2d at 955; *Truck Ins. Exch.,* 8 Cal.Rptr.2d at

---

**6.** In oral argument, defendants argued that Winchell is a *"de facto* former client" because he never followed through with Thomas. If Winchell was a former client, there is no conflict unless the issues are "substantially related." *Yarn Processing,* 530 F.2d at 89.

However, the reason Winchell never followed through was presumably that he discovered the conflict. Plaintiffs pointed out that Thomas owed work product to Winchell and suggested that he failed to follow through for the same reason.

231–32. Morgan, Lewis' concurrent representation of Dr. Winchell and Unilever is therefore, *prima facie*, cause for disqualification. However, under California law, the presumption may be rebutted if full disclosure is made and both clients agree in writing to waive the conflict. *Visa*, 241 F.Supp.2d at 1104; *Truck Ins. Exch.*, 8 Cal.Rptr.2d at 228. Since the waiver must be informed, a second waiver may be required if the original waiver insufficiently disclosed the nature of a subsequent conflict. *Visa*, 241 F.Supp.2d at 1106. Evaluation of whether the original disclosure was adequate requires a fact-specific inquiry. *Id.* Factors that may be considered include:(1) the waiver's breadth; (2) its temporal scope, i.e., whether it waived only current conflicts or applied to all conflicts in the future; (3) the quality of the conflict discussion between attorney and client; (4) the specificity of the waiver; (5) the nature of the actual conflict, i.e., whether the attorney sought to represent both clients in the same dispute or in unrelated matters; (6) the sophistication of the client; and (7) the interests of justice. *Id.* (citing, e.g., *SpeeDee Oil Change*, 86 Cal.Rptr.2d 816, 980 P.2d at 378; *Zador Corp., N.V. v. Kwan*, 31 Cal.App.4th 1285, 37 Cal.Rptr.2d 754, 758–59 (1995)).

Applying these factors to the waiver executed by Dr. Winchell at Thomas' request, Winchell Decl., Ex. 1, the Court finds as follows: (1) the terms of the waiver are extremely broad and were evidently intended to cover almost any eventuality; (2) its temporal scope is likewise unlimited; (3) the record contains no evidence of any discussion of the waiver; [7] (4) the waiver lacks specificity as to the conflicts that it covers and effectively awards Morgan, Lewis an almost blank check; (5) however, Morgan Lewis explicitly stated that it would not seek to represent Dr. Winchell and an adverse client in a "substantially related" matter; and (6) Dr. Winchell's education and business experience are strongly indicative of a high degree of sophistication. Thus, the fifth and sixth factors tend to support a finding of informed consent, but the first four weigh in the opposite direction. The interests of justice (factor 7) remain to be determined.

■ Defendants maintain that prospective conflict waiver letters are "a *sine qua non* for large law firms practicing in diverse practice and geographic areas." Defs.' Opp'n Br. at 9:9–10. It is true, as defendants assert, that a prospective waiver is not required to indicate every conceivable possibility of potential conflict. *Visa*, 241 F.Supp.2d at 1105. Here, Morgan, Lewis had no knowledge of the impending dispute between Concat/Chelator and Unilever, and no blame attaches to Thomas for failing to detect a conflict which had not yet crystallized. There is no evidence that either party was aware of the conflict until October 30, 2003, when Unilever informed Dobson that Morgan, Lewis would be its counsel in the dispute.[8]

---

**7.** Thomas states that he met with Dr. Winchell only once, on July 1, 2003, and does not list the subject among the contents of the discussion. Thomas Decl. at ¶ 2. The letter containing the waiver is dated July 2 and was not executed by the Winchells until July 22 and 23. Winchell Decl., Ex. 1.

**8.** The Court accepts Morgan, Lewis' explanation that the bill sent to Dr. Winchell with a request for immediate payment was routine, despite Dr. Winchell's suspicions that it was an attempt to obtain payment before he discovered the conflict. Def.'s Opp'n Br. at 3 n. 1; Thomas Decl. at ¶ 6; Winchell Decl. at ¶ 22. By the same token, the Court rejects defendants' suggestion that Dr. Winchell approached Thomas on a pretext, with the intention of ensnaring him in a conflict of interest. Def.'s Opp'n Br. at 9 n. 7. The Court notes in passing that this grave but unsupported accusation appears to concede that the conflict would be problematic for Morgan,

However, Morgan, Lewis should have checked for a potential conflict before agreeing to undertake representation of Unilever. It is at least arguable that, had they done so with sufficient thoroughness, they would have discovered the connection between Thomas and Concat/Chelator, *via* Dr. Winchell.

The important question, however, is why Morgan, Lewis, when it did eventually become aware of its concurrent obligations to opposing clients, failed to notify the parties and, unless they both agreed to waive the conflict, withdraw from this dispute. Under the law of this jurisdiction, even if a prospective waiver of conflict has been obtained, the attorney must request a second, more specific waiver, "if the [prospective] waiver letter insufficiently disclosed the nature of the conflict that subsequently arose between the parties." *Visa*, 241 F.Supp.2d at 1106. This Morgan, Lewis did not do. In *Visa*, the court found that a second waiver was not required because the initial waiver signed by plaintiff First Data Corporation included specific disclosure of the law firm's concurrent representation of defendant Visa U.S.A., Inc., together with a clear warning that, because First Data and Visa were business competitors, the two concurrent client relationships might, in future, give rise to conflict. *Id.* at 1107. Having been given adequate opportunity for review, First Data knowingly and specifically waived its objection to the firm's representation of Visa in future litigation against First Data. *Id. See also Zador*, 37 Cal.Rptr.2d at 764 (upholding a prospective waiver in which the prospective adverse client was named). These facts are in stark contrast to the generalized boilerplate waiver that Morgan, Lewis presented to Dr. Winchell. By

the standard that applies in this jurisdiction, Morgan, Lewis failed to obtain Dr. Winchell's—or Concat/Chelator's—informed consent to a waiver of conflict in this dispute. *See* Cal. Rules of Prof'l Conduct 3–310(C), (E).

**3. The inter-attorney screening measures instituted by Morgan, Lewis are insufficient because they were directed only to the preservation of confidentiality and did not cure the firm's breach of its duty of loyalty to its client, and because they were too late to be effective.**

 Defendants maintain that no conflict of interest exists in fact because Thomas has never shared the information he obtained from Dr. Winchell with the New York-based Morgan, Lewis attorneys representing Unilever, and because Morgan, Lewis has instituted screening measures to prevent this from occurring in the future. Defs.' Opp'n Br. at 10:12–21; Thomas Decl. at ¶ 9; Kitttredge Decl. at ¶ 3–4. In support of this argument, defendants cite the court's statement in *County of Los Angeles v. United States Dist. Court (In re County of Los Angeles)*, 223 F.3d 990, 996 (9th Cir.2000), that "[a]n ethical wall, when implemented in a timely and effective way, can rebut the presumption that a lawyer has contaminated the entire firm." However, this statement applied to "the use of screening procedures to avoid vicarious disqualification where a former judicial officer or government lawyer has joined the firm." *Id.* (citing Model Rules of Prof'l Conduct R. 1.11(a)-(b), 1.12(c)(1)). Under circumstances such as these, "the ethical wall concept has had some limited acceptance in California as a

Lewis. There is no evidence that Concat/Chelator knew in advance that Morgan, Lewis would be Unilever's counsel in this dispute.

Dr. Winchell explains that he approached Thomas on a recommendation from his son-in-law. Winchell Decl. at ¶ 4.

method to avoid what might be the unduly harsh result of vicarious disqualification of an entire firm. But that acceptance has been in a very different arena—that of former government attorneys now in private practice—and has involved a situation in which the former government attorney has not had access to confidential information concerning the subject matter of the litigation." *Henriksen v. Great Am. Sav. & Loan,* 11 Cal.App.4th 109, 14 Cal. Rptr.2d 184, 187 (1992) (citations omitted). A situation in which an individual member of a firm is disqualified because of his prior employment is quite different from one in which two partners concurrently represent adverse clients.

Although an ethical wall may, in certain limited circumstances, prevent a breach of confidentiality, it cannot, in the absence of an informed waiver, cure a law firm's breach of its duty of loyalty to its client. *Visa,* 241 F.Supp.2d at 1110. Screening measures like those instituted by Morgan, Lewis do nothing to mitigate conflict arising from concurrent adverse client relationships, since the purpose of the prohibition against such relationships is to preserve the attorney's duty of loyalty, not confidentiality, to his client. *Certain Underwriters,* 264 F.Supp.2d at 919; *Mindscape,* 973 F.Supp. at 1132–33; *Flatt,* 36 Cal.Rptr.2d 537, 885 P.2d at 955–56; *Forrest,* 67 Cal.Rptr.2d at 862; *Truck Ins. Exch.,* 8 Cal.Rptr.2d at 231–32. Since the duty of loyalty is paramount, the prohibition applies even where there is no misuse of confidential information or other evident adverse effect. *Unified Sewerage Agency,* 646 F.2d at 1345. Because the measures taken by Morgan, Lewis were directed only to the preservation of confidentiality and failed to address the issue of client loyalty, they were an ineffective response to the conflict in which the firm found itself embroiled. That a conflict of loyalty exists

in fact as well as in principle is indicated by the fact that Dr. Winchell's own attorney, Thomas, has voluntarily testified in support of defendants and in direct opposition to the interests of his client. *See* Thomas Decl. in Supp. of Defs.' Opp'n to Pls.' Mot. to Disqualify.

Even if the ethical wall could have prevented a conflict, it was not implemented before November 24, 2003, three months after Dodson's August 12 letter to Unilever initiated this dispute. Winchell Decl., Ex. 3. It was thus too late to be effective. *See LaSalle Nat'l Bank v. County of Lake,* 703 F.2d 252, 259 (7th Cir.1983) (holding that, for an ethical screen to be effective, it must be set up at the time when the potentially disqualifying event occurred); *Cobb Publishing, Inc. v. Hearst Corp.,* 907 F.Supp. 1038, 1047 (E.D.Mich.1995) (finding that a delay of eleven or eighteen days in establishing an ethical wall is too long).

Thus, Morgan, Lewis cannot escape the conflict arising from its concurrent representation of parties with adverse interests in this litigation and plaintiffs' motion to disqualify the firm from further participation in this suit is, therefore, GRANTED.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby

(1) GRANTS defendants' motion to stay this litigation pending proceedings at the London Court of International arbitration [docket # 7];

(2) DENIES defendants' motion to dismiss this litigation [docket # 7]; and

(3) GRANTS plaintiffs' motion to disqualify defendants' counsel, Morgan, Lewis & Bockius LLP, from appearing on behalf of or advising defendants, or advising other counsel, in connection with any matter associat-

ed with this dispute within the jurisdiction of this Court [docket # 12].

**IT IS SO ORDERED.**